**FIRST PRESBYTERIAN CHURCH OF SCHENECTADY, Plaintiff,**

v.

**UNITED PRESBYTERIAN CHURCH IN the UNITED STATES of America, Defendant.**

No. 77–CV–26.

United States District Court,
N. D. New York.

March 11, 1977.

---

Robert S. Trieble, Simon, Trieble & Werner, Ballston Spa, N. Y., for plaintiff; Leo Pfeffer, New York City, of counsel.

Leo Pfeffer, New York City, for plaintiff.

Mataraso & MacAffer, Albany, N. Y., for defendant; Duncan S. MacAffer, Albany, N. Y., of counsel.

## MEMORANDUM–DECISION and ORDER

JAMES T. FOLEY, District Judge.

The plaintiff, First Presbyterian Church of Schenectady, brings this action for declaratory and injunctive relief in which it seeks a judicial declaration of independence from the United Presbyterian Church in the United States of America (hereinafter UPCUSA) and injunctive relief restraining defendant from interfering with plaintiff's independent existence.

█ Jurisdiction is purportedly premised upon 28 U.S.C. §§ 2201, 2202 (Declaratory

Judgment Act) and 1331(a) (federal question). It is settled law, however, that the Declaratory Judgment Act only "enlarged the range of remedies available in the federal courts;" it did not furnish the federal courts with an additional jurisdictional basis for entertaining litigation. *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950). Plaintiff, therefore, must necessarily rely upon the general federal question statute. 28 U.S.C. § 1331(a).

Plaintiff's claim for declaratory and injunctive relief is based upon the First Amendment's Establishment and Free Exercise clauses. Plaintiff also seeks declaratory relief based upon an alleged denial of rights guaranteed under the Contract clause. U.S.Constitution, Art. I, § 10.

The gravamen of the complaint is that enforcement of N.Y. Religious Corporations Law § 17–b (McKinney's Supp.1976) contravenes the First Amendment to the Constitution of the United States and the provisions of the N.Y. Religious Corporations Law § 24. Significantly, the defendant has not initiated any action authorized by § 17–b. In fact, the defendant has expressed in his papers and during argument on the order to show cause, that no action pursuant to § 17–b is contemplated.

The matter came before me on February 22, 1977, pursuant to an order to show cause in which the plaintiff sought a temporary restraining order and a preliminary injunction. Following oral argument on the return day, I granted a limited TRO by oral direction from the Bench which permitted plaintiff to maintain the essential operations of the church (heat, electricity, fuel and minor repairs). I further directed that financial support of plaintiff's estimated forty field missionaries be continued.

It is essential to the understanding and resolution of the preliminary injunction now before the court that the structure of the various religious bodies within UPCUSA be examined.

UPCUSA is an association of Presbyterian churches governed by a hierarchical structure consisting of four distinct bodies known as judicatories. These tribunals of ecclesiastical government, in ascending order of their ruling authority are: (1) the Session and Congregation of the local church; (2) the Presbytery, composed of several churches in a geographical area; (3) the Synod, generally composed of all Presbyteries in a given State or region; and (4) the General Assembly, the highest governing body within the Presbyterian faith. *See Presbyterian Church v. Hull Church,* 393 U.S. 440, 442, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); *Watson v. Jones,* 13 Wall. 679, 727, 20 L.Ed. 666 (1872); *Matter of Presbytery of Albany,* 63 Misc.2d 791, 792, 312 N.Y.S.2d 505 (Sup.Ct.1970), *aff'd,* 35 A.D.2d 252, 315 N.Y.S.2d 428 (3rd Dept. 1970), *aff'd,* 28 N.Y.2d 772, 321 N.Y.S.2d 377, 269 N.E.2d 918 (1971), *appeal dismissed,* 404 U.S. 803, 92 S.Ct. 80, 30 L.Ed.2d 35 (1971).

The plaintiff is a religious corporation organized and incorporated in 1809 under the laws of the State of New York. The defendant is a religious corporation organized and incorporated in 1799 by the Commonwealth of Pennsylvania. Although diversity of citizenship is alleged to be one of the jurisdictional bases for the present suit, the parties' arguments in that regard are not significant for purposes of this decision. (*See infra*).

At some indeterminate date, in or about 1790, the plaintiff with its church located in the City of Schenectady became affiliated with the Presbyterian faith as a constituent of the Presbytery of Albany, the judicatory with immediate governing and administrative authority over other Presbyterian churches within this region.

On January 24, 1977, the Session and Congregation of the plaintiff, First Presbyterian Church of Schenectady, voted to sever relations with UPCUSA by a vote of 223 to 3 with 9 abstentions (*see* Plaintiff's Exhibit H). This drastic action was the final event in a dispute that arose from plaintiff's opposition to the UPCUSA's embracement of various political and social doctrines prominent in our modern society, which the large majority of plaintiff's Congregation deemed a radical departure from

the fundamental doctrine and shared religious beliefs upon which the hierarchical Presbyterian faith was founded. In particular, it is alleged in the complaint that plaintiff's Congregation was not sympathetic towards the national Church's purported financial, moral and religious support of various Marxist and other radical social and political movements, Angela Davis, militant Indian movements and organizations entertaining atheistic beliefs.

Thereafter, on February 1, 1977, the Presbytery of Albany, presumably in response to the plaintiff's action of severance, appointed an Administrative Commission "with the full power of the session" and directed the session of the First Presbyterian Church of Schenectady "to cease to act until otherwise directed by the Presbytery" (*See* Plaintiff's Exhibits B, C, and C–1). Additionally, in letters dated February 4, 1977, the Albany Presbytery, through its appointed Administrative Commission, dissolved the "pastoral relationship" which heretofore existed between plaintiff and Dr. Herbert S. Mekeel and Mr. Michael Alford (*See* Plaintiff's Exhibit D, F and G). By an earlier resolution of January 24, 1977, the Session and Congregation of the plaintiff voted that Dr. Mekeel and Mr. Alford be retained as Senior Minister and Associate Minister, respectively (*See* Plaintiff's Exhibit E).

In each instance, the Presbytery of Albany acted on the authority conferred upon it by ecclesiastical law. *See* Constitution of the United Presbyterian Church in the United States of America, Part II, Book of Order. It is with this factual background that plaintiff seeks the extraordinary relief of a preliminary injunction.

*Preliminary Injunction*

■ In order to obtain preliminary injunctive relief, the moving party must make

a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a

balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976) (emphasis in original), quoting *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973). *Accord: New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 750 (2d Cir. 1977).

*New York v. Nuclear Regulatory Commission, supra* at 750, 755 reaffirms that the movant for preliminary injunction bears a "heavy burden" in establishing a "clear showing" of entitlement to relief; that "the threat of irreparable harm is a necessary precondition of *any* preliminary injunctive relief;" and, that the alleged threat of irreparable harm may not be remote or speculative but must be actual, certain and imminent.

The various contentions advanced by the parties have been considered, and, in my judgment, the seminal case of *Watson v. Jones*, 13 Wall. 679, 20 L.Ed. 666 (1872) which together with its progeny were recently reaffirmed by the United States Supreme Court in *Serbian Eastern Orthodox Diocese, etc. v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), compels the conclusion that plaintiff has not made "a clear showing" of probable success on the merits.

In each of the examined cases, as in the issues here, the controversies found their origins in some sort of ecclesiastical discord. The use, disposition and control of the Church temporalities by the disputing factions became important aspects in the determination of these cases.

Thus, in *Watson v. Jones, supra*, the controversy was triggered by the commencement of the Civil War. The General Assembly of the Presbyterian Church issued declarations and resolutions in support of the federal government. Significant enough in terms of an analogy to the present controversy, the General Assembly also expressed views concerning the ques-

tions of emancipation and the institution of slavery.

In the years immediately following the cessation of hostilities, the Presbytery in Louisville, Kentucky, divided over these actions by the General Assembly. This schism extended to the Session and Congregation of the Walnut Street Church over which the Louisville Presbytery had immediate ecclesiastical control. The dispute finally included the Synod of Kentucky which adopted a resolution in 1867 whereby it severed its relations with the General Assembly.

■ Once this schism amongst the three judicatories became complete and irreconcilable, the civil courts were called upon to declare the beneficial uses of the church property. In this setting, the United States Supreme Court announced its "implied trust" or "deference to church authority" principle for resolution of property disputes in hierarchical churches.

> [W]henever the questions of discipline or of faith, or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them. *Watson v. Jones, supra* at 727.

The Supreme Court, however, made it clear that this principle was mandated by the prohibitions inherent in the First Amendment's Free Exercise and Establishment clauses. In that vein, *Watson* instructed that:

> The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association is unquestioned. *All who united themselves to such a body do so with an implied consent to this government and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed.* It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance subject only to such appeals as the organism itself provides for. *Watson v. Jones, supra* at 728–30 (emphasis supplied).

In compelling and striking language, *Watson* also discloses the extent of deference which the civil courts must accord to ecclesiastical determinations:

> But it is a very different thing where a subject-matter of dispute strictly and purely ecclesiastical in its character—*a matter which concerns theological controversy, church discipline, ecclesiastical government or the conformity of the members of the church to the standard of morals required of them*—becomes the subject of its action. It may be said here, also, that no jurisdiction has been conferred on the tribunal to try the particular case before it, or that, in its judgment, it exceeds the powers conferred upon it, or that the laws of the church do not authorize the particular form of proceeding adopted; and, in a sense often used in the courts, all of these may be said to be questions of jurisdiction. But it is easy to see that if the civil courts are to inquire into all of these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws and fundamental organization of every religious denomination may and must, be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws, would

open the way to all the evils which we have depicted as attending upon the doctrine of Lord Eldon, and would in effect transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions. *Watson v. Jones, supra,* at 733–34 (emphasis supplied).

And, very recently, in *Serbian Eastern Orthodox Diocese, etc. v. Milivojevich, supra,* 426 U.S. at 712–713, 96 S.Ct. at 2382, the Court further extended this deference to church authority by refusing to permit inquiry into whether the ecclesiastical determinations of a church tribunal are "arbitrary." *Milivojevich* also casts doubt upon the continued validity of the "fraud and collusion" exceptions to civil court review of ecclesiastical decisions set forth and endorsed in *Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U.S. 1, 16, 50 S.Ct. 5, 74 L.Ed. 131 (1929).

These general principles, moreover, have been applied on other occasions wherever secular interests were in danger of being implicated in matters of quintessentially ecclesiastical concern. *See Presbyterian Church v. Hull Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); *Kreshik v. St. Nicholas Cathedral,* 363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960); *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952).

Although these cases involved the use and control of church temporalities between opposing ecclesiastical factions, *Milivojevich, supra,* 426 U.S. at 710, 96 S.Ct. at 2381, also makes clear that the principles established by these cases apply with equal vigor to "church disputes over church polity and church administration."

Finally, in *Maryland and Virginia Churches v. Sharpsburg Church,* 396 U.S. 367, 368–70, 90 S.Ct. 499, 501, 24 L.Ed.2d 582 (1970), the Supreme Court reaffirmed the principle that civil courts may resolve property disputes wherever that may be accomplished without inquiry into religious doctrine. In a concurring opinion, Justice Brennan set forth three approaches by which church property disputes may be resolved without consideration of doctrinal matters: (1) deference to ecclesiastical authority; (2) "neutral principles of law;" and (3) special statutes governing church property which "leave control of ecclesiastical polity, as well as doctrine, to church governing bodies."

These cases, therefore furnish the dispositive principles to be applied in the determination as to whether the requirements for preliminary injunction have been met in this instance. Plaintiff presents a two-pronged argument. First, it claims that N.Y. Religious Corporations Law § 17–b, which permits a Presbytery to apply to the Supreme or County Court for an order vesting all property of a particular church in the appropriate Presbytery, whenever such particular church is "declared to be dissolved or extinct" by the Presbytery and the General Assembly, is in violation of the Free Exercise and Establishment clauses of the First Amendment.

Secondly, plaintiff relies upon N.Y. Religious Corporations Law § 24 which provides that the provisions of the Religious Corporations Law are not applicable to a church incorporated prior to January 1, 1828 if any such provision is inconsistent with or in derogation of any of the rights and privileges of such corporation as they existed under the law by or pursuant to which such corporation was formed. However, any church which reincorporated after 1828, or resolved that the provisions shall apply, would be subject to those provisions. The plaintiff was incorporated in 1809 by the State of New York. It has not reincorporated or resolved that the Religious Corporations Law shall apply to it. The plaintiff maintains that § 24 is merely a codification of the Contracts clause, U.S. Constitution, Art. I, § 10; therefore, any attempt to interfere with its self-determined separate existence by employment of § 17–b, would in effect, be an impairment of its contract rights as they existed in 1809.

Without considering the issue of the prematurity of seeking declaratory relief regarding the constitutionality of § 17–b under which no action has been taken or is

contemplated, see *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240–1, 57 S.Ct. 461, 81 L.Ed. 617 (1937), it is nevertheless clear from my review that plaintiff's likelihood of success in attacking the provisions of § 17–b is virtually non-existent.

In an actual controversy under § 17–b, *Matter of Presbytery of Albany, supra*, 63 Misc.2d at 793–94, 312 N.Y.S.2d at 508, the Supreme Court of Fulton County, New York, addressed the question of this statute's constitutionality under the First Amendment and held that

> [t]here is no violation of the First Amendment when civil courts decide church property disputes without interfering with or attempting to resolve underlying controversies over religious doctrine and practice, and without implicating secular interests in matters of purely ecclesiastical concern (citation omitted).

Thus, to the extent that no inquiry is made upon the attendant circumstances resulting in a declaration of dissolution or extinction by a Presbytery in connection with the General Assembly, it appears that § 17–b conforms with that type of special legislation found permissible in *Sharpsburg Church, supra.*

In recognition of this ruling, plaintiff seeks to distinguish the facts of that litigation from the present controversy by relying on § 24; that is, in *Matter of Presbytery of Albany, supra*, the Johnstown Church had reincorporated in 1966; consequently, it was not able to assert a defense under the Contract clause.

At the outset, it must be acknowledged that the Contract clause no longer carries the vitality characterized by the Dartmouth College case. *See e. g. Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). By contrast, the prohibitions of the First Amendment's religious clauses have been described as a "fixed star in our constitutional constellation." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943).

Thus, to the extent that there is any validity to plaintiff's contentions regarding the Contract clause, it is my judgment that they must give way to the commands of the First Amendment's Free Exercise and Establishment clauses.

■ Plaintiff, in effect, in my judgment, is seeking to employ the courts for vindication of its own religious principles. It has long been settled, however, that such a use of the organs of government is impermissible. In *Everson v. Board of Education*, 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947), the Court held that "[s]tate power is no more to be used as to handicap religions than it is to favor them." This principle was reaffirmed in *Abington Township v. Schempp*, 374 U.S. 203, 226, 83 S.Ct. 1560, 1574, 10 L.Ed.2d 844 (1963), which succinctly summarized a quarter century of First Amendment decisions as follows:

> In the relationship between man and religion, the state is firmly committed to a position of neutrality.

This commitment to a "wholesome neutrality" facilitates the resolution of plaintiff's motion for a preliminary injunction. So viewed, the inquiry of this Court may not extend beyond a determination that the dispute herein arose in a hierarchical church; that UPCUSA has established its own rules and tribunals for the adjudication of disputes and the discipline of its subordinate bodies; that ecclesiastical action has been taken by the appropriate judicature; and that the actions and decisions thus taken are binding upon the civil courts.

■ In this realm of internal ecclesiastical disputes, principles of contract law are singularly inapplicable. As was noted in *Watson*, the right to organize voluntary religious associations is unquestioned and "[a]ll who united themselves to such a body do so with an implied consent to this government and are bound to submit to it."

Here, the plaintiff has existed as a subordinate judicature in UPCUSA for many years. As such, it was a member of the Presbytery of Albany, submitted to its authority, and otherwise regularly partici-

 

pated in the affairs of the Church. Given these facts, an alleged contractual right to secede from a hierarchical church is anomalous to its very existence, and, is no more meritorious than a purported similar right existing in one of the States desiring to secede from the Union.

Moreover, as was noted by Justice Brennan in *Serbian Eastern Orthodox Diocese, etc. v. Milivojevich, supra,* 426 U.S. at 714–715, 96 S.Ct. at 2383:

> it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria.

This language leaves no room for introducing secular principles of contract law into "quintessentially religious controversies."

█ Up to this point, the Court has focused upon plaintiff's failure to carry the burden of establishing probable success on the merits by focusing upon case law decided on First Amendment grounds. These same cases, however, in my opinion, also establish that irreparable harm would result to the defendant rather than the plaintiff if the Court were to become entangled in this controversy. Again, it must be emphasized that this is an ecclesiastical matter, governed by Church law, and binding upon the civil courts. Controversies of the nature of this one are subject to resolution under ecclesiastical law and are not ones for judicial inquiry and decision.

Finally, it is argued that the defendant served herein is the improper party for purposes of the relief sought because its primary functions relate to the management of the Church's corporate affairs. *See* Manual of United Presbyterian Church in the United States of America, A Corporation. It is defendant's contention that given the hierarchical structure of the Church, the proper parties are the Albany Presbytery and UPCUSA, an unincorporated association with its principal offices in New York City. This issue, however, is largely academic since the Court has the power to compel the joinder of the Presbytery pursuant to Rule 19(a), Fed.R.Civ.Pro.; and, even

if the Court were to do so, that would not compel conclusions different from those set forth above.

In accordance with Rule 52, Fed.R.Civ. Pro., the Court's findings of fact and conclusions of law are set forth in this memorandum. Plaintiff's request in the order to show cause for a preliminary injunction is hereby denied and the order to show cause is dismissed. The limited temporary directions orally granted from the Bench and stated for the record on February 22, 1977, shall continue in effect until 2:00 p. m., Wednesday, March 16, 1977, and then to expire. This is to allow a reasonable time for plaintiff to apply to the Court of Appeals, Second Circuit, for a stay of the ruling herein if the plaintiff be so advised. *See* F.R.App.Proc. 8(a).

It is so Ordered.