161 N.J. Super. 230 (1978)
391 A.2d 563
THE PROTESTANT EPISCOPAL CHURCH IN THE DIOCESE OF NEW JERSEY, THE TRUSTEES OF CHURCH PROPERTY OF THE DIOCESE OF NEW JERSEY, AND THE RIGHT REVEREND ALBERT W. VAN DUZER, PLAINTIFFS,
v.
THE REVEREND STANWOOD E. GRAVES, DONALD S. MOORE, CAROLYN B. LORINCZ, GEORGE ROUSSEAU, ALPHEUS OAKES, WILLIAM E. VACTOR, SR., MICHAEL BROWN, JOANNA CHILD, JOHN HOOK, GORDON GRISWOLD, HOWARD OAKLEY, WALTER K. SMITH, AND THE RECTOR, WARDENS AND VESTRYMEN OF SAINT STEPHEN'S PARISH OF PLAINFIELD, NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided February 10, 1978.
*233 Mr. John Wood Goldsack for plaintiffs (Messrs. King, King and Goldsack, attorneys).
Mr. Daniel J. Matyola for defendants (Messrs. Wharton, Stewart & Davis, attorneys).
Mr. William B. Ball, of the Pennsylvania Bar, for defendants (Messrs. Ball & Skelly, attorneys).
ACKERMAN, J.S.C.
This matter is before the court on the return date of plaintiffs' order to show cause why certain temporary restraints imposed by this court on September 30, 1977 should not be continued. Plaintiffs have filed a motion for the imposition of certain additional restraints. Defendants have moved for summary judgment or in the alternative for an order vacating the temporary restraints.
Plaintiffs are the New Jersey Diocese of the Protestant Episcopal Church (the Church), the Trustees of the Church Property of the Diocese and the Right Reverend Albert W. Van Duzer, Bishop of the Diocese, and therefore its chief *234 ecclesiastical authority. Defendants are the Parish of St. Stephen's (St. Stephen's) in Plainfield, New Jersey, and the rector, wardens and vestrymen thereof. Defendant Reverend Stanwood E. Graves is, or was, the rector of St. Stephen's.
Certain facts are not in dispute. St. Stephen's was incorporated in accordance with the then existing New Jersey statutes on January 11, 1895, describing itself as "a religious society worshipping according to the customs and usages of the Protestant Episcopal Church." Defendants state that St. Stephen's was not incorporated under the 1901 statute specifically governing parishes of the Protestant Episcopal Church, N.J.S.A. 16:12-1 et seq., but rather under the statute governing religious societies in general, and that St. Stephen's never reincorporated under the 1901 statute.
St. Stephen's initially owned no real property. In 1935 St. Stephen's purchased a chapel. Two additional buildings were purchased as the parish hall and church school building in 1967 and 1970. In all cases the purchases were made and the buildings maintained solely out of the funds of St. Stephen's; there is no evidence of any financial contribution by the Diocese. The deeds were in all cases made out to St. Stephen's, and defendants assert that they contain no words of trust or reverter.
There is no dispute that until the controversy which is the basis of this suit St. Stephen's operated as an integral part of the Diocese and the Church. Defendants state that St. Stephen's at all times adhered to the "long established" customs and usages of the Church, and, until 1976, considered itself affiliated with the Diocese.
Plaintiffs assert that St. Stephen's has not only adhered to the "long established" customs of the Church, but that it also accepted all changes in the Church, including a change in the prayer book in 1928 and several "marked" changes in the Church Canons. Plaintiffs state that when St. Stephen's sought to sell its old rectory and place a mortgage *235 on a new one in 1973, it sought and obtained Diocese approval through the Bishop. In no instance, plaintiffs contend, did St. Stephen's ever act to determine any aspect of doctrine, discipline and/or worship in a congregational manner. Rather, plaintiffs continue, St. Stephen's consistently acted in accordance with what plaintiffs contend is the hierarchical structure of the Church.
Beginning sometime in 1975 strong doctrinal controversy began to manifest itself in the Church, in particular with regard to the ordination of women. In September 1976 the General Convention of the Church took certain positions regarding the ordination of women and other matters. On September 30, 1976 St. Stephen's sent the Right Reverend Mr. Van Duzer a letter stating that the members believed the actions of the General Convention to be "heretical"; that St. Stephen's would not accept these "new doctrines," and that St. Stephen's had therefore decided to "suspend its active fellowship with the Diocese of New Jersey." Defendants' position was, and apparently still is, that it was the General Convention, not defendants, that had actually left the Church.
On April 24, 1977 St. Stephen's voted at a special parish meeting to sever its relationship with the Diocese. On June 1, 1977 the Right Reverend Mr. Van Duzer inhibited Rev. Stanwood E. Graves "from the performance of any priestly function in the Diocese of New Jersey." Bishop Van Duzer stated that this action was taken "with the advice and consent of the Standing Committee of the Diocese of New Jersey" pursuant to Title IV, Canon 10 of the Canons of the Episcopal Church. This Canon provides in part:
Sec. 1. If any Presbyter or Deacon shall, without availing himself of the provisions of Canon IV.8, abandon the communion of this Church, by an open renunciation of the Doctrine, Discipline, or Worship of this Church, * * * it shall be the duty of the Standing Committee of the Diocese in which the said Presbyter or Deacon is canonically resident, to certify the fact to the Bishop * * *; and the said Bishop shall then inhibit the said Minister from officiating in said Diocese for six months. Notice shall be given by the Bishop *236 to the Minister so inhibited that, unless he shall, within six months, transmit to the Bishop a retraction of such acts, or make declaration that the facts alleged in said certificate are false, he will be deposed from the Ministry.
Sec. 2. If such retraction or declaration be not made within six months, as aforesaid, it shall be the duty of the Bishop to depose the said Minister from the Ministry, and to pronounce and record, in the presence of two or more Presbyters, that he has been so deposed.
In an affidavit Bishop Van Duzer explains that a priest, while inhibited, remains rector of his parish and is still entitled to receive his income, although expressly forbidden to perform priestly duties or acts. Once a priest is deposed, however, all his rights are cut off and he is no longer rector of his parish. He would therefore have no right to collect income as rector, to call or preside at parish meetings or to reside in the rectory.
On July 14, 1977 Bishop Van Duzer wrote to Mrs. Edward Lorincz, Jr., junior warden of St. Stephen's, stating that he sought reconciliation; that Rev. Graves had been inhibited, and that a supply priest would be furnished to conduct services on Sunday, July 24. Dr. Donald Moore, warden of St. Stephen's, replied in a letter dated July 20, 1977 iterating the parish's earlier position.
Plaintiffs contend, and defendants do not dispute, that Rev. Graves continued to conduct services at St. Stephen's and that the supply priest was denied permission to officiate. Plaintiffs then instituted this lawsuit. On September 30, 1977 this court, relying chiefly on the authority of Kelly v. McIntire, 123 N.J. Eq. 351 (Ch. 1938), entered an order temporarily restraining defendants from diverting any parish property to any use not sanctioned by plaintiffs, and restraining Rev. Graves from preaching or conducting services in St. Stephen's until such time as his inhibition was removed. The return date of said order has been adjourned and the restraints continued until today by consent of all parties.
On November 28, 1977, several days before the six-month period expired, Rev. Graves sent Bishop Van Duzer a letter stating, "I hereby declare that the facts alleged by you as *237 being grounds for said inhibition are false." Bishop Van Duzer responded in a letter dated November 29, 1977 stating that Rev. Graves' declaration was insufficient since the inhibited minister "must state what facts are false" and "should declare what the true facts are." In Rev. Graves' case, the letter continued, it had been alleged that he had "abandoned the communion of this Church by open renunciation of its discipline," so that Rev. Graves should submit a statement that
* * * you have not abandoned the ministry of the Protestant Episcopal Church in the United States of America and that you consider yourself a presbyter in good standing in the Protestant Episcopal Church in the United States of America, subject to the doctrine, discipline and worship of the Protestant Episcopal Church in the United States of America and to the Constitution and Canons of that Church and those of the Diocese of New Jersey, and subject to my jurisdiction and spiritual authority as Bishop of the Diocese of New Jersey.
No response from Rev. Graves was forthcoming, and he was deposed on December 1, 1977.
It appears from the affidavits that Bishop Van Duzer assigned the Reverend Canon J. Perry Cox to serve as priest for St. Stephen's. Rev. Cox states that the average attendance at Sunday services is 15 or 16 people, including members of at least seven families from the original parish. This statement is supported by the affidavit of Carlton R. Annis, a member of St. Stephen's, who states that his family, as well as at least eight others, were forced to worship elsewhere by the actions taken by Rev. Graves and the other defendants. Defendants have responded with an affidavit to the effect that average attendance has been only two at the 8 A.M. mass and six at the 10 a.m. mass, most of those persons not parish members.
It is, in any event, clear that the overwhelming majority of the original membership of St. Stephen's agree with defendants' position. It appears that approximately 200 persons attend the services conducted by Rev. Graves in *238 another building, and defendants provide the affidavits of numerous parishioners to the effect that they support Rev. Graves and cannot in good conscience attend the services currently being conducted by Rev. Cox at St. Stephen's.
Plaintiffs' complaint demands declaratory judgment that all of St. Stephen's property is impressed with a trust in favor of the Diocese, that all members who have elected to withdraw from the Diocese have no interest in the real and personal property of the parish, and that all property is to be used solely in accordance with the Constitution and Canons of the Church and the Diocese. The complaint also seeks a temporary injunction restraining defendants from the use of, entry into, removal of or transfer of any parish property, real or personal.
Plaintiffs' motion today seeks preliminary injunctive relief placing all parish property under the control of the Trustees of Church Property of the Diocese, removing Rev. Graves from the rectory of St. Stephen's and prohibiting him from entering St. Stephen's Church or parish house except to attend religious services or other events approved by the Diocese. Plaintiffs also seek to add Charles Curtis and Arnold Gardner, two additional vestrymen of St. Stephen's, as defendants. There being no opposition, that application will be granted. In their brief, plaintiffs make it clear that they are also asking in the alternative for summary judgment. Although this should have been sought by notice of motion, there is no prejudice to defendants in the court's consideration of the matter at this time, and, in the interests of justice, the court will treat the matter as if the motion had been properly made.
Defendants have moved for an order dismissing the complaint or alternatively for summary judgment. Since the motion to dismiss relies on matters outside the pleadings, including numerous affidavits, it must be dealt with as a motion for summary judgment. R. 4:6-2(e). Defendants move in the alternative for a vacation of restraints.
*239 Since the grant of summary judgment to either party would render consideration of preliminary injunctive relief unnecessary, the court will consider these applications first.
R. 4:46 governs all motions for summary judgment. R. 4:46-2 states:
The motion for summary judgment shall be served with briefs and with or without supporting affidavits. The judgment or order sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. The court shall find the facts and state its conclusions in accordance with R. 1:7-4. A summary judgment or order interlocutory in character may be rendered on any issue in the action (including the issue of liability) although there is a genuine factual dispute as to any other issue (including any issue as to the amount of damages). Subject to the provisions of R. 4:42-2 (judgment upon multiple claims), a summary judgment final in character may be rendered in respect of any portion of the damages claimed.
Summary judgment is appropriate where "a discriminating search of the merits in the pleadings, depositions and admissions on file, together with the affidavits submitted on the motion clearly shows not to present any genuine issue of material fact requiring disposition at a trial." Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74 (1954). The moving party must sustain the burden of showing the absence of "any reasonable doubt as to the existence of any genuine issue of material fact." Id.
Summary judgment is "granted with extreme caution. The moving papers and pleadings are to be considered most favorably to the party opposing the motion. All doubts are to be resolved against the movant." Ruvolo v. American Cas. Co., 39 N.J. 490, 499 (1963); see Seltzer v. Isaacson, 147 N.J. Super. 308, 312-313 (App. Div. 1977). "The papers supporting the motions are closely scrutinized and the opposing papers indulgently treated." Judson, supra 17 N.J. at 75.
*240 If, however, "the opposing party offers no affidavits or matter in opposition, or only facts which are immaterial or of insubstantial nature, a mere scintilla, * * * `fanciful, frivolous, gauzy or merely suspicious,'" summary judgment is appropriate. Id. While it is desirable to afford every litigant with a bona fide cause of action an opportunity for full exposure of his case, there is a countervailing consideration that "protection is to be afforded against groundless claims and frivolous defenses." United Rental Equip. Co. v. Aetna Life & Cas. Ins. Co., 74 N.J. 92, 99 (1977); Robbins v. Jersey City, 23 N.J. 229, 240-241 (1957). If a party shows by affidavit, however, that for specific reasons he cannot present essential facts in opposition, the court may deny the motion, order a continuance to permit additional discovery, or make such other order as may be proper. R. 4:46-5(a).
The court should be especially cautious in granting summary judgment where the opposing party is "heavily dependent upon the production by his adversary of evidence and factual data pertinent to his claim or position," Joseph v. Lesnevich, 56 N.J. Super. 340, 351 (App. Div. 1959), or "where the subjective elements of willfulness, intent or good faith of the moving party are material to the claim or defense of the opposing party." Judson, supra 17 N.J. at 76; see Allen v. Eversham Tp. Planning Bd., 137 N.J. Super. 359, 364 (App. Div. 1975).
Several issues are contested in this case. Specifically raised by either or both of the parties are the questions of whether defendants hold their property in trust for the diocese, whether the Church is hierarchical in nature, and whether defendants have indeed departed from Church doctrines. As will be seen by a review of the applicable state and federal law, some of these matters are beyond the province of the courts to determine.
The New Jersey case most closely on point appears to be Kelly v. McIntire, supra. Defendants were the Collingswood Presbyterian Church, a religious corporation incorporated *241 under the General Religious Society Act of 1875, and its pastor, Rev. Carl McIntire. Vice-Chancellor Davis described the structure of the Presbyterian Church in those terms:
* * * The Collingswood Presbyterian Church has been one of a large number of churches composing the church known as the Presbyterian Church in the United States of America, and has been governed by the judicatories of that church under the immediate jurisdiction and care of the Presbytery of West Jersey, an assembly of representatives of the several churches in the denomination within a certain district in this state * * *. In the governmental structure of the Presbyterian Church * * *, the next assembly or judicatory above the Presbytery of West Jersey having jurisdiction over The Collingswood Presbyterian Church is the Synod of New Jersey, which is composed of representatives of all of the Presbyterian congregations of the denomination in the State of New Jersey. The Supreme assembly and judicatory of the denomination is the General Assembly of the Presbyterian Church in the United States of America, which is composed of representatives from every presbytery in the denomination, and represents in one body all the churches of the denomination. [123 N.J. Eq. at 353]
In 1934 the General Assembly ordered all ministers and laymen to sever connections with a body known as the Independent Board for Presbyterian Foreign Missions. Rev. McIntire refused to observe this mandate and was duly suspended by the Presbytery of West Jersey, which suspension was sustained by the Synod of New Jersey and the General Assembly. Rev. McIntire was deposed on June 30, 1936, but continued to preach and conduct services in the Collingswood Church, contending that he had renounced the authority of the Presbyterian Church in the United States of America. On June 15, 1936 a large majority of those present at a church meeting had voted to sever the congregation's relationship with the Presbyterian Church in the United States of America.
The Presbytery of West Jersey then ordered the members of the session of the church to cease to act, and the committee on supply and vacancy was given powers of session to cooperate with those members of the church who had *242 remained loyal to the national body. Defendants nevertheless continued to exercise authority, Rev. McIntire continued to conduct services and the reverend appointed by the Presbytery to conduct services was prevented by defendants from doing so. Suit was brought to enjoin defendants from diverting the property of the church to any purpose not sanctioned by the Presbyterian Church of the United States of America.
The court in Kelly first held that under the New Jersey statutes a trust was impressed upon property acquired by the local church for the benefit of the national body. Id. at 358. The court relied in part upon N.J.S.A. 16:1-25, a general provision applicable to all religious corporations, which provided, and still provides:
No rector, wardens or vestrymen, or trustees, consistory or session of any incorporated church, congregation or religious society of this state shall divert the estate, property or revenue belonging thereto to any purpose other than the support and maintenance of the church or religious or benevolent institution or object connected with the church or denomination to which the corporation belongs. The highest judicatory of any denomination from which property is attempted to be diverted in violation hereof, may enforce this provision, but nothing herein contained shall prevent action being taken by members of the congregation or otherwise to enforce such provision.
The court then said, "The principle seems to be firmly established that a congregation belonging to a religious denomination and subject to the constitution, faith and doctrines thereof, cannot use its property for a purpose other than that sanctioned by the denomination." Id. at 361. The court relied in part on Schilstra v. Van Den Heuvel, 82 N.J. Eq. 155 (Ch. 1913), aff'd in pertinent part, 82 N.J. Eq. 612 (E. & A. 1914), in which it was stated:
Independent churches may do what they please with their property, provided legal action is taken to that end, but when a religious society becomes affiliated with other religious societies and they unite to construct and maintain for their mutual advantage higher *243 judicatories to which they subject themselves, then the individual society or worshiping unit holds its property and temporalities under an obligation to continue the affiliation until it can be broken by mutual consent; and if secession is attempted by a faction, however large or however small, such faction will not be allowed to carry the church property with it, certainly not so long as there is a loyal body which is recognized by the superior judicatory. [at 166]
The court also relied on the following language from Presbytery of Jersey City v. First Presbyterian Church, 80 N.J.L. 572 (Sup. Ct. 1910):
A local congregation is never independent, but ab initio an integral part of the denomination; this is the implied condition of its existence, and binds all its members. * * * While properly affiliated with the denominational body, the congregation can act with a certain degree of independence, but they can never use the property in such a way as to amount to a use not denominational in character; that is, to a use other than that sanctioned by the denomination to which such congregation belongs. * * * For instance, they cannot secede and take their property with them, even if they do so unanimously. [at 579]
More importantly for present purposes, the Kelly court relied extensively on the decision of the United States Supreme Court of Watson v. Jones, 13 Wall. 679, 80 U.S. 679, 20 L.Ed. 666 (1872). In that case the court described three classes of property disputes involving religious bodies:
1. The first of these is when the property which is the subject of the controversy has been, by the deed or will of the donor, or other instrument by which the property is held, by the express terms of the instrument devoted to the teaching, support or spread of some specific form of religious doctrine or belief.
2. The second is when the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority.
3. The third is where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete in some supreme judicatory over the whole membership of that general organization. [13 Wall. at 722-723, 80 U.S. at 722-723, 20 L.Ed. at 674]
*244 In the third class of cases, the court held, "we are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments." 13 Wall. at 726-727, 80 U.S. at 726-727, 20 L.Ed. at 676. In such cases ecclesiastical decrees concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them" could not be reviewed by civil court. 13 Wall. at 723, 80 U.S. at 733, 20 L.Ed. at 678. In the case before it the court therefore held:
* * * [T]he appellants in the case before us have separated themselves wholly from the church organization to which they belonged when this controversy commenced. They now deny its authority, denounce its action and refuse to abide by its judgments. They have first erected themselves into a new organization, and since joined themselves to another totally different, if not hostile, to the one to which they belonged when the difficulty first began. Under any of the decisions which we have examined, the appellants, in their present position, have no right to the property, or the use of it, which is the subject of this suit. [13 Wall. at 734, 80 U.S. at 734, 20 L.Ed. at 678]
As noted, the Kelly court relied heavily on Watson, and granted plaintiffs the injunctive relief prayed for. The court thus enjoined any diversion of church property to any use not sanctioned by the national body, directed the trustees to hold such property in trust for all members loyal to the national body, and enjoined Rev. McIntire from preaching or conducting services in the church until his censures had been removed. 123 N.J. Eq. at 365-366.
The principles stated in Kelly were reaffirmed in St. John's Greek Catholic Church v. Fedak, 96 N.J. Super. 556 (App. Div. 1967), certif. den. 50 N.J. 406 (1967), where the court said:
In the case of property belonging to a particular ecclesiastical organization which is part of a larger general church organization, *245 a majority cannot secede from that organization and transfer the property of the church to another use. [at 577]
Defendants implicitly recognize that if Kelly were to be applied, plaintiffs would be entitled to the relief sought. They argue, however, that Kelly has been effectively overruled by several relatively recent developments in First Amendment law. The court must therefore examine the cases cited by defendants to determine to what extent, if any, they require a different result than that apparently dictated by Kelly.
In Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presb. Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (Blue Hull), a dispute arose between petitioner, the national body to which the local churches had belonged, and two local churches over control of the local church property. As in this case, the local churches, believing that certain actions of the national body were a departure from church doctrines, voted to withdraw from the general church. After attempts at reconciliation failed, the general church accepted the local churches' withdrawal and took over the church property. The local churches brought suit in the Georgia courts.
The matter was submitted to a jury:
* * * "on the theory that Georgia law implies a trust of local church property for the benefit of the general church on the sole condition that the general church adhere to its tenets of faith and practice existing at the time of affiliation by the local churches." Thus, the jury was instructed to determine whether the actions of the general church "amount to a fundamental or substantial abandonment of the original tenets and doctrines of the [general church], so that the new tenets and doctrines are utterly variant from the purposes for which the [general church] was founded." [393 U.S. at 443-444, 89 S.Ct. at 603, 21 L.Ed.2d at 662]
The jury found for the local churches, and the trial court thereupon declared the implied trust to be at an end. The Supreme Court of Georgia affirmed, 224 Ga. 61, 159 S.E.2d 690 (1968).
*246 On certiorari, the U.S. Supreme Court unanimously reversed. The court first cited Watson with approval, saying:
There, as here, the Court was asked to decree the termination of an implied trust because of departures from doctrine by the national organization. The Watson Court refused, pointing out that it was wholly inconsistent with the American concept of the relationship between church and state to permit civil courts to determine ecclesiastical questions. [393 U.S. at 445-446, 89 S.Ct. at 604, 21 L.Ed.2d at 663]
The court then cited several subsequent cases and concluded:
Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. [393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665]
Applying these principles the court found that:
* * * the departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of a religion  the interpretation of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role. [393 U.S. at 450, 89 S.Ct. at 606, 21 L.Ed.2d at 666]
The court, therefore, did not hold the implied trust theory itself invalid, but only the "departure-from-doctrine" element of the theory.
The implications of Blue Hull were considered in Serbian Eastern Orthodox Cong. v. Serbian Eastern Orthodox Cong., 106 N.J. Super. 22 (App. Div. 1969), certif. den. 54 N.J. *247 516 (1969), cert. den. 397 U.S. 961, 90 S.Ct. 994, 25 L.Ed.2d 254 (1970). In that case two groups were striving for control over the Congregation of St. George in Elizabeth. The mother church had subdivided the American and Canadian Diocese into three, and had sought to transfer the Bishop of the old diocese to a new one. The Bishop was at that time suspended from office pending hearing of certain charges against him.
The Bishop opposed the subdivision. Certain members of St. George's decided to support him and participated in a Diocesan Assembly in which the old diocese declared its independence of the mother church. Those members of St. George's who sought to remain loyal to the mother church were expelled. The Bishop was subsequently reduced to layman status by the mother church and his followers branded schismatics who had lost their rights and privileges in the Serbian Orthodox Church.
The Chancery Division, following Watson, declared the decision of the mother church binding and ordered that St. George's be turned over to those loyal to the mother church. While appeal was pending, Blue Hull was decided. In affirming the lower court, the Appellate Division held that Blue Hull "also calls for affirmance." 106 N.J. Super. at 25. Blue Hull precluded the court from reviewing either the removal of the Bishop or the subdivision of the old diocese. Id. at 26. In conclusion, the Appellate Division said:
Thus it would appear that the basic conclusions of the trial judge rest, not upon his determination of ecclesiastical questions whose determination by the courts may be inhibited by [Blue Hull] or Watson v. Jones, supra, but upon the recognition of decisions made by the highest authority of the mother church of which the Church of St. George was a constituent part from the time of its organization [at 27]
In Maryland & Virginia Eldership v. Church of God at Sharpsburg, Inc., 249 Md. 650, 241 A.2d 691 (Ct. App. 1968) (Sharpsburg), the Maryland high court affirmed a *248 lower court dismissal of an action by the Church of God Eldership to prevent two local churches from withdrawing and to obtain the local church's property. On appeal, the United States Supreme Court vacated the judgment and remanded the case for further consideration in light of Blue Hull, 393 U.S. 528, 89 S.Ct. 850, 21 L.Ed.2d 750 (1969).
On remand, the Maryland Court of Appeals reaffirmed its earlier decision. 254 Md. 162, 254 A.2d 162 (1969). The Eldership was held to have no interest in the local church's property upon examination of (1) the provisions of state statutory law; (2) the express language of the deeds; (3) the language of the church charters, and (4) the provisions of the Constitution of the Eldership. The Maryland Court also rejected the Eldership's argument that the property rights of a local church were only incidental to the Eldership's determination of the identity of clergymen, saying that court decision of property disputes in such a manner as "to provide effective discipline and control of a denomination over its clergy or to maintain that denomination's `purity of doctrine' * * * would be `establishment of religion' with a vengeance * * *." 254 Md. at 175, 254 A.2d at 170.
On appeal, the United States Supreme Court dismissed for want of a substantial federal question, saying only that "the Maryland court's resolution of the dispute involved no inquiry into religious doctrine." 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed. 2d 582 (1970). Justice Brennan, the author of the Blue Hull decision, concurred in the per curiam dismissal of the appeal, but also wrote an opinion in which Justices Marshall and Douglas joined.
Citing Blue Hull, Justice Brennan said:
It follows that a state may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.
Thus the states may adopt the approach of Watson * * * and enforce the property decisions made within a church of congregational *249 polity "by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government" * * * and within a church of hierarchical polity by the highest authority that has ruled on the dispute at issue, unless "express terms" in the "instrument by which the property is held" condition the property's use or control in a specified manner. [396 U.S. at 368-369, 90 S.Ct. at 500, 24 L.Ed.2d at 584]
In a footnote Justice Brennan quoted Watson for the definition of congregational polity as existing where "a religious congregation * * * by the nature of its organization, is strictly independent of other ecclesiastical associations, as so far as church government is concerned, owes no fealty or obligation to any higher authority." Hierarchical polity was defined as existing when "the religious organization * * * is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization." 396 U.S. at 369 n. 1, 90 S.Ct. at 500 n. 1, 24 L.Ed.2d at 584 n. 1.
Justice Brennan went on to say, "Under Watson civil courts do not inquire whether the relevant governing church body has power under religious law to control the property in question." 396 U.S. at 369, 90 S.Ct. at 500, 24 L.Ed.2d at 584.
The Watson approach may be used so long as "the appropriate church governing body can be determined without the resolution of doctrinal questions and without extensive inquiry into church polity." 396 U.S. at 370, 90 S.Ct. at 501, 24 L.Ed.2d at 584.
Justice Brennan cited as possible alternatives to the Watson approach the "formal title" theory espoused in Blue Hull and apparently used by the Maryland court in Sharpsburg. Under this theory the court restricts itself to general theories of state property law. Finally, Justice Brennan suggested that a state might pass "special statutes governing church property arrangements in a manner that *250 precludes state interference in doctrine." 396 U.S. at 370, 90 S.Ct. at 501, 24 L.Ed.2d at 584-585.
It appears, then, that the Sharpsburg formal title approach which defendants argue is constitutionally mandated is in fact only one of several constitutionally permissible approaches. The Watson approach, utilized by New Jersey courts in Kelly and Serbian Eastern Orthodox, would also seem to be constitutionally permissible.
The third case cited by defendants is Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). This case involved the same Bishop and same basic set of facts as did the New Jersey Serbian Eastern Orthodox case. In Milivojevich the Bishop sued the mother church, claiming that his defrockment was procedurally and substantively defective under the internal regulations of the mother church. The Illinois Supreme Court agreed, and also held the Diocesan reorganization into three Dioceses invalid. On certiorari, the United States Supreme Court reversed. Writing for the court Justice Brennan cited his opinion in Sharpsburg for the proposition that
* * * [W]here resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchial polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them. [426 U.S. at 709, 96 S.Ct. at 2380, 49 L.Ed.2d at 162]
Justice Brennan went on to say:
Resolution of the religious disputes at issue here affects the control of church property in addition to the structure and administration of the American-Canadian Diocese. * * * Resolution of the religious dispute over [the Bishop's] defrockment * * * determines control of the property. Thus, this case essentially involves not a church property dispute, but a religious dispute the resolution of which under our cases is for ecclesiastical and not civil tribunals. [426 U.S. at 709, 96 S.Ct. at 2380, 49 L.Ed.2d at 162-163] *251 After a review of the law as set forth in Watson and Blue Hull as well as other cases, Justice Brennan concluded for the court:
In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them. [426 U.S. at 724-725, 96 S.Ct. at 2387, 49 L.Ed.2d at 171]
A review of these cases leads to the conclusion that Kelly v. McIntire is still good law in the State of New Jersey insofar as it applies to this case. This court is plainly without power to determine whether either plaintiffs or defendants have departed from the doctrine of the Protestant Episcopal Church under Blue Hull, nor can the court determine the propriety of Rev. Graves' deposition under Milivojevich. But the court need do neither in order to follow Kelly. Kelly is based on the "implied trust" theory of Watson without the "departure-from-doctrine" test held invalid in Blue Hull. Kelly simply requires that hierarchical churches be permitted to resolve property disputes internally, and that the courts are bound by such decisions. As stated by Justice Brennan's concurrence in Sharpsburg, this is a constitutionally permissible mode of resolving church property disputes. See also, Schaad v. Ocean Grove Camp Meeting Ass'n, 72 N.J. 237, 283, n. 11 (1977) (Pashman, J. concurring and dissenting); First Presbyterian Church v. United Presbyterian Church, 430 F. Supp. 450 (N.D.N.Y. 1977).
Defendants have raised some question as to whether the Protestant Episcopal Church is in fact hierarchical. Defendants' position is considerably undermined by the statement in their brief that
*252 The structure of the Protestant Episcopal Church is not "hierarchical" in that sense [that the Roman Catholic Church is], but is much closer to that of the Presbyterian Church in the United States, a church neither "hierarchical" nor "congregational" but having a government structured in an ascending order, with a general convention at the top which is "formed by representatives from the entire organization."
The Presbyterian Church, it will be recalled, was specifically deemed to be hierarchical, and treated as such for the purpose of resolving property disputes, in Watson and Kelly.
Defendants' position is further undermined by the undisputed evidence that St. Stephen's considered itself a part of the Protestant Episcopal Church and acquiesced in its policies, as well as the policies of the Diocese, for 82 years. An examination of the Constitution and Canons of both the general Church and the Diocese buttresses the conclusion that the Church is, at least for the purposes of this case, hierarchically structured.
Turning first to the Constitution of the general Church, Art. I establishes the General Convention, consisting of a House of Bishops and House of Deputies. Art. II discusses the role of the Bishop as ecclesiastical authority of each Diocese. Art. IV provides for the establishment by the Convention of a Standing Committee to advise and counsel the Bishop in each Diocese. Under Art. V new Dioceses are to be formed with the consent of the general Convention. Under Art. VIII a priest or deacon may only be appointed to minister in the Church upon examination by the Bishop and two priests. Art. IX provides for the discipline of Bishops by courts established by the Convention, and for the trial of presbyters and deacons in Diocesan courts, with possible review by a court established by the Convention. While a detailed review of the Canons is not necessary, attention should be paid to Canon 12, § 1, which states, "Every Congregation of this Church shall belong to the Church in the Diocese in which its place of worship "is *253 situated." Canon 13 specifically makes subject to the law of the Diocese the election of parish wardens and vestrymen.
The Constitution and Canons of the Diocese make the hierarchical nature of the Church even clearer. In Art. I the Diocese "accedes to the Constitution and Canons of the General Convention * * * and acknowledges their authority." Under Art. VI a new parish may be admitted only upon evidence of, among other things, (2) the consent of the Ecclesiastical Authority; (3) its promise of conformity and obedience to the doctrine, discipline and worship of the Protestant Episcopal Church in the United States of America, and to the Constitution and Canons of the General Convention and of this Diocese; * * *." See also, Canon 17 to the same effect.
The court believes that there is no material fact adduced by defendants which could lead this court to find that the Protestant Episcopal Church is not hierarchically structured. The test of Watson, quoted by Justice Brennan in Sharpsburg, that a religious organization be but a subordinate part of a general church organization in which there are superior ecclesiastical tribunals with a more or less complete power of control is plainly met here. The court therefore finds that the Protestant Episcopal Church is hierarchically structured as a matter of law.
Defendants have also argued that the wardens and Vestrymen are agents of the parish for the management of property under Church law. Defendants rely on Canon 13, § 2, of the Protestant Episcopal Church, which provides, "Except as provided by the law of the State or of the Diocese, the Vestry shall be agents and legal representatives of the Parish in all matters concerning its corporate property and the relations of the Parish to the Clergy." Reference is also made to Canon 9, § 6 of the Diocese, which states in part:
Where the title to real estate of a duly incorporated parish is vested in the Trustees of Church Property or the Trustees of the Episcopal *254 Fund, such parish may apply, in writing, to the Trustees * * * to convey the title to such property to such corporation * * *.

* * * * * * * *
Provided, however, that no conveyance shall be made without the written consent of the Bishop and a majority of the Standing Committee.
On their face, neither of these provisions appear to contradict plaintiffs' basic assertion that parish use of local church property is subject to Diocesan and Church approval. But even if these provisions, or any other provisions of the Canons or Constitutions of either the Church or the Diocese, did raise questions as to control of property, this court would be powerless to consider such matters.
The Milivojevich case, cited supra, is relevant to this question. In that case the Illinois Supreme Court, in addition to invalidating the Bishop's defrockment, had declared the division of the old diocese into three new dioceses by the Mother Church void as being "in clear and palpable excess of its own jurisdiction." 426 U.S. at 721, 96 S.Ct. at 2386, 49 L.Ed. 2d at 169. The Illinois Court looked to the history of the Serbian Orthodox Church and the constitutions of the Diocese and the Church to conclude that the Diocese was administratively, although not ecclesiastically, independent of the Mother Church.
The United States Supreme Court found this line of inquiry highly improper, saying, "[T]he Supreme Court of Illinois substituted its interpretation of the Diocesan and Mother Church constitutions for that of the highest ecclesiastical tribunals in which church law vests authority to make that interpretation. This the First and Fourteenth Amendments forbid." 426 U.S. at 721, 96 S.Ct. at 2386, 49 L.Ed.2d at 169-170. The court went on to say:
Contrary to the interpretation of the Illinois Court, the church judicatories interpreted the provisions of the Diocesan constitution not to interdict or govern this action, but only to relate to the day-to-day administration of Diocesan property. The constitutional provisions of the American-Canadian Diocese were not so express that the civil courts could enforce them without engaging in a searching *255 and therefore impermissible inquiry into church polity. [426 U.S. at 722-723, 96 S.Ct. at 2386-2387, 49 L.Ed.2d at 170]
Also relevant is the previously-quoted language of Justice Brennan's concurrence in Sharpsburg, which bears repeating here:
Under Watson civil courts do not inquire whether the relevant church governing body has power under religious law to control the property in question. Such a determination, unlike the identification of the governing body, frequently necessitates the interpretation of ambiguous religious law and usage. To permit civil courts to probe deeply enough into the allocation of power within a church so as to decide where religious law places control over the use of church property would violate the First Amendment in much the same manner as civil determination of religious doctrine. [396 U.S. at 369, 90 S.Ct. at 500, 24 L.Ed.2d at 584]
The court therefore cannot consider the terms of the Constitution and Canons of the Church and Diocese to decide whether the Diocese or the Parish actually controls the property in question. This is a matter which is vested solely in the Church authorities. The Diocese has decided that the parish property may only be used for certain purposes, and under Watson and its progeny, this decision is binding on the court.
The court further holds that Kelly has not been undermined by recent Supreme Court decisions. Rather, Kelly adopted the Watson approach specifically approved by Justice Brennan in Sharpsburg and apparently approved by the court in Milivojevich. Under this approach a local church which is a part of a hierarchical organization holds all its property in implied trust for the superior ecclesiastical authority and cannot use that property for any purpose not sanctioned by the higher authority. This is so regardless of the number of the members of the local body opposed to the higher authority, or of the source of the funds with which the property was purchased.
Applying these principles to the instant case, the court finds plaintiffs entitled to the relief sought as a matter *256 of law. Defendants are fully entitled to withdraw from the Diocese if they so desire, but their property is held in trust for the Diocese, and cannot be used for any purpose not sanctioned by the Diocese. Plaintiffs' motion for summary judgment is granted.
Plaintiffs will be granted the declaratory relief sought in the complaint. Plaintiffs will also be granted a permanent injunction placing all assets of St. Stephen's under the control of the Trustees of Church Property of the Diocese of New Jersey until the proper Church authorities shall otherwise determine and removing Rev. Graves from the Rectory of St. Stephen's Church and prohibiting him from entering St. Stephen's Church or parish house except to attend worship services or social events approved by the Diocese.[1]
No costs will be awarded to either party.
NOTES
[1] On subsequent reconsideration of this matter, the court granted Rev. Graves permission to remain in the rectory through March 31, 1978.