Jane Holmes DIXON, Plaintiff–Appellee,

v.

Samuel L. EDWARDS; The Vestry of St. John's Parish, Defendants–Appellants.

Jack Leo Iker, Right Reverend, Bishop of the Episcopal Diocese of Fort Worth; Robert Duncan, Right Reverend, Bishop of the Episcopal Diocese of Pittsburgh; Peter James Lee, Right Reverend, Bishop of the Episcopal Diocese of Virginia; Neff Powell, Right Reverend, Bishop of the Diocese of Southwestern Virginia; Robert W. Ihloff, Right Reverend, Bishop of the Diocese of Maryland; John Rabb, Right Reverend, Suffragan Bishop of the Diocese of Maryland; Clifton Daniel, 3rd, Right Reverend, Bishop of the Diocese of East Carolina; Michael B. Curry, Right Reverend, Bishop of the Diocese of North Carolina; J. Gary Gloster, Right Reverend, Suffragan Bishop of the Diocese of North Carolina; James A. Kelsey, Right Reverend, Bishop of the Diocese of Northern Michigan; Carolyn Tanner Irish, Right Reverend, Bishop of the

**700**

Diocese of Utah; Orris G. Walker, Jr., Right Reverend, Bishop of the Diocese of Long Island; Charles E. Bennison, Jr., Right Reverend, Bishop of the Diocese of Pennsylvania; William E. Swing, Right Reverend, Bishop of the Diocese of California; J. Jon Bruno, Right Reverend, Bishop of the Diocese of Los Angeles; Chester L. Talton, Right Reverend, Suffragan Bishop of the Diocese of Los Angeles; Robert M. Anderson, Right Reverend, Bishop Assistant of the Diocese of Los Angeles; Robert L. Ladehoff, Right Reverend, Bishop of the Diocese of Oregon; William Otis Gregg, Right Reverend, Bishop of the Diocese of Eastern Oregon; Vincent W. Warner, Right Reverend, Bishop of the Diocese of Olympia; James Edward Waggoner, Right Reverend, Bishop of the Diocese of Spokane; Harry B. Bainbridge, III, Right Reverend, Bishop of the Diocese of Idaho; Katharine Jefferts Schori, Right Reverend, Bishop of the Diocese of Nevada; Richard S.O. Chang, Right Reverend, Bishop of the Diocese of Hawaii; Allen L. Bartlett, Jr., Right Reverend, Bishop of the Diocese of Pennsylvania (retired); James W. Montgomery, Right Reverend, Bishop of the Diocese of Chicago (retired); Theodore Eastman, Right Reverend, Bishop of the Diocese of Maryland (retired); Ronald H. Haines, Right Reverend, Bishop of the Diocese of Washington (retired), Amici Curiae.

No. 01–2337.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 24, 2002.

Decided May 22, 2002.

**ARGUED:** Charles Hart Nalls, Dekieffer & Horgan, Washington, D.C., for Appellants. David Martin Schnorrenberg, Crowell & Moring, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Michael G. Van Arsdall, Crowell & Moring, L.L.P., Washington, D.C., for Appellee. Kenneth R. Matticks, Dallas, Texas, for Amici Curiae Iker and Duncan. Russell V. Palmore, Jr., George A. Somerville, Troutman, Sanders, Mays & Valentine, L.L.P., Richmond, Virginia, for Amici Curiae Lee, et al.

Before MOTZ, KING, and GREGORY, Circuit Judges.

Affirmed and remanded by published opinion. Judge KING wrote the opinion, in which Judge MOTZ and Judge GREGORY joined.

## OPINION

KING, Circuit Judge.

Plaintiff Jane Holmes Dixon is the Bishop *Pro Tempore* of the Diocese of Washington, one of approximately a hundred such entities constituting the Protestant Episcopal Church of the United States of America (the "Episcopal Church" or "the Church"). Defendant Samuel L. Edwards is an ordained Priest of the Church who claims entitlement to the office of Rector of St. John's Parish in Accokeek, Maryland, a parish within the Diocese of Washington ("St. John's" or "the Parish"). In June 2001, Bishop Dixon sued Father Edwards and the Vestry of St. John's (the "Vestry") in the District of Maryland, seeking, inter alia, a declaration that Father Edwards is not the Rector of St. John's. The court granted summary judgment to Bishop Dixon, and it awarded her both declaratory and injunctive relief. For the reasons explained below, we affirm the district court, but we remand on a limited aspect of the injunction.

### I.

In December 2000, the Vestry selected Father Edwards to be its Rector. Bishop Dixon, however, as the Ecclesiastical Authority for St. John's, declined to license Father Edwards to officiate within the Diocese of Washington.[1] Despite Bishop Dixon's refusal to approve his selection, Father Edwards moved from Texas to Maryland and began to act as Rector of St. John's. When Bishop Dixon visited the Parish and sought to officiate there on May 27, 2001, the Vestry and Father Edwards (collectively, the "Defendants") refused to permit her to enter the church building.[2]

---

1. An ecclesiastical authority is the responsible individual or body in a church institution. In a diocese of the Episcopal Church, such authority rests with the diocesan bishop. In the absence of a bishop, such authority falls to whomever the diocese designates as the substitute ecclesiastical authority. *See* Canon IV.15.

2. St. John's Parish has two separate houses of worship: Christ Church, located in Accokeek, Maryland, and the Pomonkey Chapel, located nearby in Pomonkey, Maryland. The visitation of Bishop Dixon on May 27, 2001, occurred at Christ Church, but Father Edwards claims rectorship of the entire Parish.

Bishop Dixon promptly filed this civil action, asserting diversity jurisdiction pursuant to the provisions of 28 U.S.C. § 1332. By her complaint, she sought, inter alia, a declaration (1) of her rights as Bishop of the Diocese, (2) that the Vestry's use of Parish property was unlawful, and (3) that the purported contract between Father Edwards and the Vestry was null and void. The Bishop requested the court to enjoin the Defendants from interfering with the performance of her duties at St. John's. She also sought to enjoin Father Edwards from (1) officiating at religious services on or near the grounds of St. John's, (2) acting as Rector of the Parish, and (3) using or occupying the buildings or grounds of St. John's.

On October 29, 2001, the district court filed its Opinion and related Order awarding summary judgment, along with corresponding declaratory and injunctive relief, to Bishop Dixon. *Dixon v. Edwards,* 172 F.Supp.2d 702 (D.Md.2001). The court thereafter, on November 21, 2001, slightly modified the permanent injunction awarded by its earlier Opinion and Order. On appeal, the Defendants seek reversal of the district court on multiple grounds. After first reviewing the relevant structure of the Church and the factual underpinnings of this dispute, we will address each of their issues.

## II.

### A.

In order to properly consider the issues in this appeal, we must first understand certain elementary aspects of the structure of the Church. As a predicate proposition, the Episcopal Church is a national church governed by its Constitution, its Canons, and its Book of Common Prayer. *Constitution & Canons, Together with the Rules*

*of Order, For the Government of the Protestant Episcopal Church in the United States of America Otherwise Known as The Episcopal Church,* adopted in General Conventions 1789–2000, as revised by the 2000 Convention (Church Publ'g Inc.2000); *The Book of Common Prayer and Administration of the Sacraments and Other Rites and Ceremonies of the Church, Together with the Psalter or Psalms of David, According to the Use of the Episcopal Church* (Church Hymnal Corp.1979) (the "*BCP* "). The Constitution of the Church creates a bicameral government made up of a House of Bishops and a House of Deputies, which together comprise the General Convention of the Episcopal Church. The General Convention elects the Church's Presiding Bishop.

The Episcopal Church is geographically divided into approximately a hundred dioceses. This controversy arose in the Diocese of Washington, which consists of the District of Columbia and the Maryland counties of Charles, St. Mary's, Prince George's, and Montgomery. Each diocese of the Church is presided over by a diocesan bishop, and each diocese is empowered to adopt rules for the choice of its bishop. A diocese is also authorized to elect two suffragan, or assisting, bishops.[3] When a bishop resigns or dies, the diocese may place a suffragan bishop in charge, as its interim ecclesiastical authority, until a new bishop is chosen and consecrated. From January 2001 to the present, Bishop Dixon has served the Diocese of Washington as such a "temporary bishop," denominated as its Bishop *Pro Tempore.*

Within each diocese of the Church, various parishes are formed by smaller subdivisions of churches or congregations. A parish is governed by its vestry, i.e., its elected lay leaders. The vestry is the

---

**3.** The Canons of the Diocese of Washington provide for a single suffragan bishop.

agent and legal representative of the parish in all matters concerning parish property and in all matters concerning the relationship of the parish to its clergy. The vestry of each parish elects a priest to serve as its rector. A rector possesses authority over and responsibility for the conduct of worship services, and the rector has spiritual jurisdiction over the parish "subject to the Rubrics of the Book of Common Prayer, the Constitution and Canons of the Church, and the pastoral direction of the Bishop." Canon III.14.1. The rector, who is a member of the vestry, presides at its meetings.[4]

When a parish has no rector, the bishop of the diocese serves as rector *ex officio* while the parish conducts a search for a priest to elect as its rector. The procedures for installing a rector are established by Canon III.17, and they include the requirement that a vestry communicate its choice of rector to the bishop, who is granted "sufficient time, not exceeding thirty days ... to communicate with the Vestry thereon." Moreover, the ecclesiastical authority is obligated to forward the notice of election to the General Convention when she is "satisfied that the person so chosen [as rector] is a duly qualified Priest."[5] With this basic understanding of

the structure of the Episcopal Church, we turn to the relevant facts underlying the dispute in this case.

### B.

On November 19, 1992, Bishop Dixon was elected and consecrated as the Suffragan Bishop of the Diocese of Washington. The then—incumbent. Diocesan Bishop, the Right Reverend Ronald H. Haines, retired from office on December 31, 2000. On January 1, 2001, Bishop Dixon assumed the position of Bishop *Pro Tempore* and became the Ecclesiastical Authority of the Diocese. The Constitution of the Diocese provides that, in these circumstances, the Suffragan Bishop becomes the Ecclesiastical Authority, and Bishop Dixon thereby became Bishop *Pro Tempore* of the Diocese.

St. John's is one of ninety-five parishes within the Diocese of Washington, and its rectorship became vacant sometime in 1998. On December 13, 2000, its Vestry selected Father Edwards, a canonical resident of the Diocese of Fort Worth, in the State of Texas, as Rector of the Parish.[6] The Vestry advised Bishop Haines of its selection of Father Edwards by letter of its Senior Warden.

---

4. In the absence of a rector (and when the bishop is not present) a vestry is presided over by the senior warden of the parish, who is a lay member elected by the parish members.

5. Canon III.17, entitled "Of the Calling of a Rector," provides in pertinent part as follows:
 Sec. 2. No election of a Rector shall be held until the name of the Priest whom it is proposed to elect has been made known to the Bishop, if there be one, and *sufficient time, not exceeding thirty days, has been given to the Bishop to communicate with the Vestry thereon ....*
 Sec. 3. Written notice of the election, signed by the Wardens, shall be sent to the Ecclesiastical Authority of the Diocese. If

the Ecclesiastical Authority be satisfied that the person so chosen is a *duly qualified Priest* and that the Priest has accepted the office, the notice shall be sent to the Secretary of the Convention, who shall record it. (emphasis added).

6. A bishop, priest, or deacon of the Episcopal Church is canonically resident within a diocese when he or she (1) has been ordained there, or (2) has been canonically received into the diocese by the ecclesiastical authority thereof by acceptance of what are called letters dimissory. Members of the clergy serving under the jurisdiction of the ecclesiastical authority of a diocese are canonically resident in that diocese.

Before Bishop Dixon assumed her position as the Ecclesiastical Authority of the Diocese of Washington on January 1, 2001, she advised the Senior Warden of St. John's that she could not approve Father Edwards, as contemplated by Canon III.17, *supra* note 5, until she had completed a standard satisfactory background investigation of him. In conjunction with this investigation, she scheduled a meeting with Father Edwards, to be held on January 10, 2001. On January 3, 2001, however, Father Edwards requested that Bishop Dixon re-schedule this meeting for sometime after January 13, 2001. Bishop Dixon's administrative assistant then informed Father Edwards that "prior to the Bishop's issuing of the call [ ... to the rectorship] and the negotiation of a contract, she must have access to all your paper-work, including a background check, and she must meet with you in person."

On January 9, 2001, Bishop Dixon's administrative assistant informed the Vestry that Father Edwards had cancelled his scheduled meeting with Bishop Dixon. She further informed it that the background investigation and meeting relating to Father Edwards's selection as Rector of St. John's were "required prior to the Bishop's issuance of a call to ministry." She advised the Vestry that "we cannot move forward without these two pieces having been completed." Despite this advice, the Vestry, on January 22, 2001, notified Bishop Dixon of its intent to enter into an employment contract with Father Edwards. On February 6, 2001, Father Edwards and the Vestry signed such an employment contract, naming Father Edwards as Rector of St. John's.[7] The meeting between Bishop Dixon and Father Edwards, initially scheduled for January 10, 2001, was rescheduled and eventually held on February 26, 2001. On March 6, 2001, Bishop Dixon orally advised Father Edwards that she did not find him "duly qualified," and that she would not license him as Rector of St. John's. By a detailed letter of March 8, 2001, Bishop Dixon notified the Vestry of her decision.[8] Father Edwards nonetheless moved from Texas to Maryland, and he began officiating at St. John's on March 25, 2001.

Pursuant to the Canons of the Church, a priest is permitted to officiate for two months within a diocese in which he is not canonically resident without a license from the ecclesiastical authority of that diocese. Canon III.16.2. On March 28, 2001, within the two-month window, Bishop Dixon attended a meeting of the Vestry and advised it that, in accordance with canonical provisions, she intended to preside, due to the absence of a Rector. The Defendants, however, refused to permit the Bishop to

7. The Vestry, however, did not consider the contract to be final and binding, but rather as being subject to Bishop Dixon's approval. The minutes of the Vestry meeting of February 15, 2001, reflect that the Senior Warden "reported that Father Edwards will be meeting with the Bishop on February 26, 2001.... Following some discussion, it was felt that the Vestry should not spend money on moving [expenses for Father Edwards] until the new Rector meets with the Bishop and we get final approval."

8. In her correspondence to the Vestry of March 8, 2001, Bishop Dixon explained her refusal to license Father Edwards, and in so doing cited derogatory remarks he had made about the Episcopal Church, including that "the machinery of the Church is hell-bound," and his teaching the importance of "gumming up the works of the Church." Opinion at 707; 172 F.Supp.2d at 708. Furthermore, Father Edwards had advised her that his obedience to her, "as a woman bishop, would be limited; ... he would not guarantee that he would obey her instructions regarding her visitation to Christ Church ... and he would not guarantee her that he would not attempt to lead Christ Church out of the Church or attempt to take Church property as part of that effort." *Id.*

preside, asserting that Father Edwards was the Rector of St. John's. Father Edwards then presided over the Vestry meeting of March 28, 2001, and members of the Vestry indicated to Bishop Dixon that they considered Father Edwards to be the Rector of St. John's. On May 15, 2001, five Bishops of the Episcopal Church met with the Church's Presiding Bishop, the Most Reverend Frank T. Griswold, but they were unable to resolve the conflict existing at St. John's. On May 22, 2001, the Vestry of St. John's requested the Right Reverend Jack Leo Iker, Bishop of the Diocese of Fort Worth, to place St. John's under his "episcopal protection." [9]

Having been denied a license to officiate within the Diocese of Washington, Father Edwards, pursuant to the two-month window provided by Canon III.16.2, could not properly officiate at St. John's after May 25, 2001. Shortly thereafter, on May 27, 2001, Bishop Dixon visited Christ Church for the purpose of presiding over the Eucharist, a prerogative granted her by *The Book of Common Prayer*.[10] On that occasion, however, members of the Vestry informed Bishop Dixon that, while she could enter Christ Church to worship, she was not entitled to preside over the Eucharist. As a result, Bishop Dixon conducted an alternate religious service on an outdoor basketball court on the grounds of Christ Church. At the outdoor service, a retired Bishop read aloud a letter from Bishop

Iker, of the Diocese of Fort Worth, granting St. John's his "episcopal protection." Certain individuals then sought to interfere with Bishop Dixon's alternate service, and members of the Vestry threatened to sue Bishop Dixon and to have her arrested for trespassing.

On May 27, 2001, Bishop Dixon designated former Bishop Haines to act as priest-in-charge of St. John's until a new rector could be selected. Each Sunday in the weeks thereafter, alternate services were conducted at a community center near Christ Church for those St. John's parishioners who preferred not to receive the sacraments from Father Edwards. On May 29, 2001, fifteen members of the clergy filed three ecclesiastical charges against Father Edwards with the Diocese of Washington, alleging his breach of the Canons of the Church. Because Father Edwards was canonically resident within the Diocese of Fort Worth, these charges were transferred to that Diocese. On December 17, 2001, the Standing Committee of the Episcopal Diocese of Fort Worth issued a Presentment against Father Edwards on one of the three charges, dismissing another charge and noting that the third charge had been withdrawn.[11] The Presentment was then referred for trial to the Ecclesiastical Trial Court of the Diocese of Fort Worth.[12]

On July 13, 2001, two separate sets of ecclesiastical charges were filed against

---

9. It is unclear what the term "episcopal protection" signifies. According to the Canons, however, Bishop Iker possessed no power to usurp Bishop Dixon's authority within her jurisdiction, and Bishop Dixon did not cede to him any of her authority as Bishop of the Diocese of Washington. *See* Canon III.24.2 ("No Bishop shall perform episcopal acts ... in a Diocese other than that in which the Bishop is canonically resident, without permission or a license to perform occasional public services from the Ecclesiastical Authority of the Diocese in which the Bishop desires to officiate.").

10. The Eucharist is "the sacrament of the Holy Communion." *Webster's Unabridged Dict.* 667 (2d ed.1998).

11. A Presentment is a charging document, specifying an alleged offense by a priest, deacon, or bishop, that is subject to an ecclesiastical trial.

12. The record does not reflect whether a final decision has been made on the Presentment against Father Edwards.

Bishop Dixon with the Presiding Bishop's Review Committee of Bishops for the Episcopal Church (the "Review Committee").[13] They alleged, inter alia, that Bishop Dixon had "consistently and intentionally acted contrary to the spirit and letter of the Constitution and Canons of the General Convention, by exceeding the thirty (30) day limit for objecting to the call of a rector by a parish and ... rebuk[ing] and recant[ing] several reconciliation efforts by the Parish prayerfully undertaken...." These charges, one made by three Bishops and the other made by certain members of the clergy and laity, requested the Review Committee to determine whether Bishop Dixon was entitled, under the Constitution and Canons of the Church, to veto the selection of a Rector chosen in accordance with the Canons.

On September 5, 2001, the Review Committee dismissed the ecclesiastical charges against Bishop Dixon, unanimously concluding that "no offense has occurred under Title IV of the Canons of the Episcopal Church" and that Bishop Dixon's actions were "not contrary to definitive canonical authority." Acknowledging that the complainants and Bishop Dixon adhered to conflicting views of the relevant Canons, the Review Committee concluded that "[b]oth parties apparently hold these views in good faith and with the support of their advisors and canonical commentators." *In the Matter of the Right Rev'd Jane Holmes Dixon,* Report of the Title IV Review Committee of the Episcopal Church (Sept. 5, 2001).

### C.

During this process, Bishop Dixon's lawsuit, filed against the Defendants on June 5, 2001, was proceeding through the court system. In early July 2001, prior to the filing of the ecclesiastical charges against Bishop Dixon, the Defendants sought dismissal of her lawsuit. They asserted that she lacked standing, that the court lacked jurisdiction over her claims, and that the complaint failed to state a claim upon which relief could be granted. Bishop Dixon, on her part, sought summary judgment against the Defendants. Among her submissions in support thereof was the report of the Review Committee, concluding that she had committed no offense under the Canons.

Thereafter, the district court, on October 29, 2001, filed its initial Opinion and related Order, granting summary judgment to Bishop Dixon, and declaring that:

a) Bishop Dixon or her delegate has a right to be present in the buildings and on the grounds of St. John's Parish in Accokeek, Maryland and to perform duties as Bishop and Rector *Ex Officio* there, and her actions on May 27, 2001 did not, and similar future actions by her or her delegate will not, constitute trespass;

b) Bishop Dixon has the right to preside at meetings of the Vestry and Parish of St. John's;

c) The purported contract between the Vestry of St. John's Parish and Father Edwards engaging him as Rector of the St. John's Parish is invalid, null and void, unenforceable and without effect;

d) The acts of the Vestry of St. John's Parish in contracting with Father

---

**13.** Title IV of the Canons, which deals with ecclesiastical discipline, creates this Review Committee for the Church, which functions to investigate charges filed against bishops. Canon IV.3.27. Title IV also creates a diocesan review committee in each diocese to examine allegations of misconduct leveled against priests and deacons. Canon IV.3.1.

Edwards to be and holding him out as rector of the Parish and in preventing Bishop Dixon from presiding at vestry meetings and performing other acts as Rector *Ex Officio* are *ultra vires* and of no force and effect;

e) Under Maryland Vestry Act, 1976 Laws of Md. Ch. 96, § 312J, Defendant Edwards is not the Rector of Christ Church, St. John's Parish; and

f) Under Maryland Vestry Act, 1976 Laws of Md. Ch. 96, § 312G, Father Edwards is unlawfully using and occupying buildings and property of St. John's Parish.

Order at 1–2; 172 F.Supp.2d at 720–21. Furthermore, the court, by its initial Order, enjoined Father Edwards and the Vestry as follows:

a) [They] shall take no actions, directly or indirectly, to prevent Bishop Dixon or her delegate from performing her duties at St. John's Parish, including officiating at services and ministering to its congregation, and presiding at the meetings of the Vestry and Parish of St. John's;

b) Father Edwards shall not officiate at religious services on or near the grounds of St. John's Parish;

c) Father Edwards shall take no actions as Rector of St. John's Parish, including, but not limited to, presiding at

meetings of the Vestry or officiating at services of St. John's Parish;

d) Father Edwards shall not use or occupy the building or grounds of St. John's Parish;

e) Except for his vacating of the rectory at St. John's Parish, which Father Edwards may take up to ten (10) days to accomplish, this injunction shall take effect immediately.

Order at 3; 172 F.Supp.2d at 721.

On November 2, 2001, the Defendants noticed their appeal to this Court, and they also filed with the district court a motion for a stay of judgment pending appeal. On November 21, 2001, the court denied the motion, with the exception of a limited modification of its injunction.[14] *Dixon v. Edwards,* Opinion, Civ. No. PJM 01 CV 1838 (D.Md. Nov. 21, 2001) (the "Modification Opinion" and the "Modification Order"). By its Modification Order, it provided that "Father Edwards shall be permitted to conduct religious services at least 300 feet distant from the perimeter of Christ Church, St. John's Parish in Accokeek, Maryland."[15] The court also imposed an additional restriction, ordering that "[i]n conducting such services, Father Edwards shall not in any way hold himself out as being licensed by the Ecclesiastical Authority of the Episcopal Diocese of Washington."

**14.** As a general proposition, the timely filing of a notice of appeal confers jurisdiction in the court of appeals "and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982). In this situation, however, the district court retained authority to act as it did because, even after the filing of a timely notice of appeal, a "district court does not lose jurisdiction to proceed as to matters in aid of the appeal." *Lytle v. Griffith,* 240 F.3d 404, 408 (4th Cir. 2001) (citation and quotation omitted). The

court did exactly that; it "aided in this appeal by relieving us from considering the substance of an issue begotten merely from imprecise wording in the injunction." *Id.*

**15.** The Modification Opinion of November 21, 2001, and its related Order, contain some differences in their provisions, particularly with respect to Paragraph (b) of the injunction. These differences, and their potential significance, are discussed more fully *infra* at Part VI.

Father Edwards and the Vestry have appealed the district court's rulings to this Court, requesting that we reverse the Order and the Modification Order and remand the case with instructions that it be dismissed. Primarily, they assert that we lack subject matter jurisdiction due to pending ecclesiastical proceedings in the Diocese of Fort Worth.[16] They also maintain that we lack subject matter jurisdiction because Bishop Dixon does not possess standing to sue, and because the Diocese is a necessary, though non-diverse, party. Its joinder would therefore destroy diversity, and consequently our basis for jurisdiction. Finally, they contend that the injunction should be vacated for multiple reasons, including the claim that it contravenes the First Amendment rights of Father Edwards.

### III.

■■■ We review an award of summary judgment de novo, employing the same standards as the district court. *Hartsell v. Duplex Prods. Inc.*, 123 F.3d 766, 771 (4th Cir.1997). At the summary judgment stage, we view the underlying facts in the light most favorable to the non-moving party. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 928 (4th Cir.1995). Because this is a diversity case, we apply to it the same substantive principles a state civil court would utilize, but we adhere to federal procedural principles. *See Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 109 (4th Cir.1995). We review a district court's award of equitable relief for abuse of discretion, accepting the court's factual findings absent clear error, while examining issues of law de novo. *Id.; Starter Corp. v. Converse, Inc.*, 84

F.3d 592, 594 (2d Cir.1996). When a district court grants an injunction, the scope of such relief rests within its sound discretion. *Virginia Soc. for Human Life, Inc. v. Fed. Elec. Comm'n*, 263 F.3d 379, 392 (4th Cir.2001). Similarly, we must sustain a district court's determination of whether a party is "necessary," pursuant to Rule 19 of the Federal Rules of Civil Procedure, unless the court abused its discretion in making such a finding. *Nat. Union Fire Ins. Co. v. Rite Aid*, 210 F.3d 246, 250 (4th Cir.2000).

### IV.

Our first task, of course, is to satisfy ourselves that we possess jurisdiction to consider this appeal. *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir.1999). During oral argument and in supplemental briefing, the parties disagreed on whether Bishop Dixon's claim against the Defendants satisfied the "amount in controversy" requirement of 28 U.S.C. § 1332, and they also disagree on whether Bishop Dixon possesses standing to pursue relief in this proceeding. Before considering any issues concerning pending ecclesiastical proceedings or the First Amendment, we must examine the predicate jurisdictional and standing issues.

### A.

■■■ In this circuit, it is settled that the test for determining the amount in controversy in a diversity proceeding is "the pecuniary result to either party which [a] judgment would produce." *Gov't Employees Ins. Co. v. Lally*, 327 F.2d 568, 569 (4th Cir.1964). The complaint of Bishop Dixon seeks, inter alia, a declaration that the actions of the Vestry and Father Ed-

---

**16.** At oral argument and in supplemental briefing, the Defendants questioned whether Bishop Dixon, a resident of the District of Columbia, satisfied the prerequisite of 28 U.S.C. § 1332, upon which jurisdiction is predicated, that more than $75,000 is in controversy.

wards are *ultra vires* and that the contract between them is null and void.[17] Under the "either-party" rule, as explained by our Judge Bell in *Lally*, Bishop Dixon has placed Father Edwards's employment contract and its monetary value in issue. Indeed, the Defendants concede in their submissions that, "if the contract is invalidated, Rev. Edwards loses compensation worth more than $75,000 and the Vestry is deprived of services it has valued at that amount." Appellants' Supp. Reply Br. at 6. Therefore, as the Vestry acknowledges, the injunction will cause Father Edwards to lose in excess of $75,000, and the Vestry will be denied his services, which it has valued at more than that sum. It is thereby clear that Bishop Dixon satisfies the monetary requirement for diversity jurisdiction.[18]

**B.**

■ The Defendants also maintain that Bishop Dixon lacks standing to pursue her claims, and that the Diocese of Washington is a "necessary" party to the proceeding. With respect to the standing question, the Supreme Court, in *Lujan v. Defenders of Wildlife,* has carefully explained the "irreducible constitutional minimum" required. 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 154 (4th Cir. 2000) (en banc). First, Bishop Dixon must have suffered an injury in fact, i.e., "an invasion of a legally protected interest

which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130 (internal citations and quotations omitted). Second, her injuries must be fairly traceable to the actions of the Defendants, rather than the result of actions by some independent third party not before the court. *Id.* at 560–61, 112 S.Ct. 2130. Third, it must be likely, as opposed to merely speculative, that her injuries will be redressed by a favorable decision. *Id.*

**1.**

**a.**

Bishop Dixon plainly possesses, consistent with the first prong of *Lujan,* a legally protectable interest in the authority of her office. In her complaint, she seeks, inter alia, to enforce her right as Bishop of the Diocese to preside at St. John's as Rector *ex officio* and as President of the Vestry in the absence of a Rector, and she also seeks a declaration that Father Edwards is not the Rector of St. John's. She alleges no claims as Jane Holmes Dixon, an individual, but she instead pursues claims only in her capacity as Bishop of the Diocese of Washington.

With regard to those claims, we observe that Jane Holmes Dixon, individually, would possess no right or authority to, e.g., preside at meetings of the Vestry or to celebrate the Eucharist upon visitation

---

17. In support of this assertion, Bishop Dixon observes that as of February 15, 2001, the Vestry considered her approval of its selection of rector to be a condition precedent to formation of a contract with Father Edwards. *See supra* n. 7; *Foster & Kleiser v. Baltimore Co.,* 57 Md.App. 531, 470 A.2d 1322, 1325–26 (1984) (finding that an offer is not binding, and no contract formed, if something more than the seller's assent, e.g., approval by a higher authority, is required).

18. Because the amount in controversy requirement is satisfied, we need not address Bishop Dixon's alternate rationales: that the value of the free exercise of her religion exceeds the jurisdictional sum of $75,000, and that her subjective valuation of access to the Parish property exceeds $75,000.

to a parish of the Diocese. However, as Bishop of the Diocese of Washington, she has alleged and factually supported her possession of such authority. While the Diocese itself has no right to preside at meetings of the Vestry in the absence of a Rector, Bishop Dixon, by virtue of her office, is plainly vested with such a right. The Diocese possesses no right to celebrate the Eucharist upon visitation, nor any right of visitation. On the other hand, Bishop Dixon, by virtue of her office, clearly holds and possesses such rights, under the "hierarchical framework of the Episcopal Church," to "minister to the congregation of St. John's." Complaint ¶ 23. While the Diocese may be injured if one of its parishes flouts the Constitution and Canons of the Church, such an injury would be different from those that Bishop Dixon alleges she has suffered.[19]

To remedy the encroachment upon her authority by Father Edwards and the Vestry, Bishop Dixon is entitled in these circumstances to turn to the civil courts. *See Protestant Episcopal Church v. Graves,* 161 N.J.Super. 230, 391 A.2d 563 (1978) (granting declaratory and injunctive relief to bishop regarding control of parish property); *Fiske v. Beaty,* 206 A.D. 349, 201 N.Y.S. 441 (N.Y.App.Div.1923) (enjoining purported rector from conducting religious services or occupying rectory, and prohibiting use of property in violation of rules of the church, upon action of bishop against vestry of parish and alleged rector). Because Bishop Dixon possesses rights that are legally enforceable, we must next assess whether she has alleged a sufficient injury in fact to her rights as Bishop.

b.

The first prong of *Lujan* also requires that the invasion of the legally protected right be both concrete and actual, rather than merely hypothetical. With regard to Bishop Dixon's right to be present on Parish property, it is undisputed that certain members of the Vestry, as well as others, threatened her with criminal prosecution and suit for trespass when she attempted to conduct services at St. John's on May 27, 2001.[20] The Defendants maintain, however, that Bishop Dixon was not, on that occasion, threatened for being on the property of St. John's as an individual, but instead for the improper attempt to exert power by virtue of her office. It is significant that, even when acting in her official capacity, Bishop Dixon may be subject to personal liability for the tort of trespass. *Fletcher v. Havre de Grace Fireworks Co.,* 229 Md. 196, 177 A.2d 908, 910 (1962). In this regard, she sought a declaration that she could not be liable for trespass, in order that she could conduct her ministry without threat of personal liability. *See Steffel v. Thompson,* 415 U.S. 452, 454–55, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). A threat of liability for civil or criminal trespass constitutes the type of injury that, in the language of the Court, is both "concrete and particularized," and "actual or imminent." *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. Under her allegations, and on this record, concrete and

---

**19.** For these reasons, Bishop Dixon satisfies the prudential standing requirement that she assert her own legal rights and not those of third parties. *See Valley Forge Christian Coll v. Ams. United for Separation of Church and State, Inc.,* 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (citation and quotations omitted).

**20.** In their submissions in this appeal, the Defendants maintain that they are contemplating a counterclaim against Bishop Dixon for interference with the employment contract between Father Edwards and the Vestry. Appellants' Br. at 32.

actual harm was inflicted by the Defendants upon Bishop Dixon, rather than upon the Diocese.

Additionally, Bishop Dixon was in fact injured when the Defendants denied her the right to act as Bishop of the Diocese of Washington. In *Raines v. Byrd,* certain members of the United States Senate asserted the loss of prestige and power of their institution as an injury in fact, and the Supreme Court concluded that they lacked standing to remedy such an "institutional" injury. 521 U.S. 811, 821, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). On the other hand, when a claimant asserts the right to an office, or if an officeholder asserts rights held by virtue of his office, he possesses standing to sue for denial of those rights. *See Raines,* 521 U.S. at 821, 117 S.Ct. 2312 ("[A]ppellees' claim of standing is based on a loss of political power, not loss of any private right, which would make the injury more concrete."); *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). It is also significant that Bishop Dixon does not claim that the Church itself has been injured in its power or prestige by the Defendants. Rather, she asserts that Father Edwards and the Vestry have interfered with the exercise of the authority she possesses *as Bishop* of the Diocese. In such a circumstance, she has alleged a sufficient injury in fact.

### 2.

■ It is also clear that Bishop Dixon satisfies the second and third prongs of the *Lujan* test. With regard to the second prong, Bishop Dixon's injury is fairly traceable to the Defendants. Finally, under the third prong of *Lujan,* the district court is fully capable of redressing Bishop Dixon's injuries with a decision in her favor. *See Sims v. Greene,* 160 F.2d 512 (3d Cir.1947) (allowing action for injunction by bishop of African Methodist Episcopal Church against another bishop, where church was not a party). Indeed, the Defendants make no contention that Bishop Dixon was not afforded full relief on her claims by the Order and Modification Order of the district court. As such, under the *Lujan* principles of standing, Bishop Dixon may pursue her claims against these Defendants.

### 3.

Because Bishop Dixon possesses standing to sue to enforce her rights as bishop, our inquiry into whether the Diocese is a "necessary party" in this proceeding is simplified. *See Clinton v. City of New York,* 524 U.S. 417, 434–35, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) ("Once it is determined that a particular plaintiff is harmed by the defendant, and that the harm will likely be redressed by a favorable decision, that plaintiff has standing—regardless of whether there are others who would also have standing to sue.").

■ Rule 19 of the Federal Rules of Civil Procedure requires joinder of a party when "in the person's absence complete relief cannot be accorded among those already parties." The Defendants suggest that, in order to resolve this lawsuit, the court was required to decide who *owned* the Parish property. We are unable to agree, because the injunction entered by the district court in fact gave Bishop Dixon complete relief. The injunction does not concern property ownership, but only the rights of access and control over the Parish property—that is, the question of who is in charge, not who owns the land. Therefore, this facet of the Rule 19 contention must fail.

The Defendants also assert that the Diocese is necessary under Rule 19(b)(2), which requires joinder when failure to do

so would "leave any of the persons already parties subject to a substantial risk of . . . inconsistent obligations." Although the Diocese claims an interest in the Parish property, no substantial risk of inconsistent judgments is presented. First, the relief granted does not, as explained above, implicate the ownership of the Parish property. Second, both the Standing Committee and the Diocesan Council support Bishop Dixon's decision to pursue relief in her capacity as Bishop, and they advised the district court that she adequately represents any overlapping interests of the Diocese. *See* Declaration of David Thomas Andrews, President of the Standing Committee of the Diocese of Washington, *Dixon v. Edwards,* Civ. No. PJM 01 CV 1838 (D.Md. July 28, 2001); Declaration of David B. Maglott, Moderator of the Diocesan Council of the Diocese of Washington, *Dixon v. Edwards,* Civ. No. PJM 01 CV 1838 (D.Md. July 30, 2001). There is no substantial risk of inconsistent judgments when potential plaintiffs agree that one of them will litigate and represent the interests of the other. *Coastal Modular Corp. v. Laminators, Inc.,* 635 F.2d 1102, 1103 n. 3 (4th Cir. 1980); *see also Washington v. Daley,* 173 F.3d 1158, 1167 (9th Cir.1999). Therefore, the district court did not abuse its discretion in concluding that the Diocese of Washington is not a necessary party in this proceeding.

## V.

We now turn to the primary contention raised on appeal by the Defendants, that we lack subject matter jurisdiction because the Establishment and Free Exercise Clauses of the First Amendment preclude any involvement by a civil court in this

dispute.[21] The Defendants assert that pending ecclesiastical proceedings against Father Edwards in the Diocese of Fort Worth are material to this case and should be permitted to proceed, and they maintain that the district court, in accepting jurisdiction and ruling against them, unconstitutionally acted as an ·arbiter of the religious doctrine of the Episcopal Church.

As we explain below, the civil courts of our country are obliged to play a limited role in resolving church disputes. This limited role is premised on First Amendment principles that preclude a court from deciding issues of religious doctrine and practice, or from interfering with internal church government. When a civil dispute merely involves a church as a party, however, and when it can be decided without resolving an ecclesiastical controversy, a civil court may properly exercise jurisdiction. The courts must avoid any religious inquiry, however, and they may do so by deferring to the highest authority within the church.

### A.

#### 1.

It is axiomatic that the civil courts lack any authority to resolve disputes arising under religious law and polity, and they must defer to the highest ecclesiastical tribunal within a hierarchical church applying its religious law. *Serbian E. Orthodox Diocese for the United States & Canada v. Milivojevich,* 426 U.S. 696, 709, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). More than a hundred years ago, the Supreme Court succinctly observed:

> whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of

---

**21.** The Establishment and Free Exercise Clauses of the First Amendment provide that "Congress shall make no law respecting an

establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

the[ ] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

*Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871). Under the constraints of the First Amendment, when a subordinate in a church hierarchy disputes a decision of the highest ecclesiastical tribunal, the civil courts may not constitutionally intervene.

The Court has consistently recognized that First Amendment values are jeopardized when church litigation turns on the resolution by civil courts of controversies over religious doctrine and practice. *See Milivojevich*, 426 U.S. at 709–10, 96 S.Ct. 2372. As Justice Brennan observed, " '[t]he First Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.' *This principle applies with equal force to church disputes over church polity and church administration.*" *Id.* (emphasis added) (quoting *Presbyterian Church v. Hull Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969)).

■ In assessing whether to exercise jurisdiction in a civil proceeding involving a church, it is important to determine whether the church is of a "hierarchical" nature. If the church is hierarchical, a civil court should defer to the final authority within its hierarchy, declining even to determine whether an ecclesiastical decision is arbitrary, i.e., whether it has complied with church laws and regulations. *Id.* In fact, it is clear that "a civil court must accept the ecclesiastical decisions of church tribunals as it finds them," "on matters of discipline, faith, internal organization, or ecclesiastical rule, custom or law." *Id.*

2.

The Defendants provide two separate bases for their contention that we owe no deference to the decision of Bishop Dixon declining to license Father Edwards in the Diocese of Washington. First, they maintain that the Episcopal Church is not hierarchical, and second, they contend that Bishop Dixon is not the final ecclesiastical decisionmaker on Father Edwards's licensure in the Diocese. We address each of these contentions in turn.

■ The Defendants first maintain that the Episcopal Church is not a "hierarchical" church, but, to the contrary, it is a church that is "constitutional, collegial, and conciliar." In its *Milivojevich* decision in 1976, the Court noted several factors that "confirmed" its conclusion that the Serbian Orthodox Church is hierarchical. 426 U.S. at 715–16 & n. 9, 96 S.Ct. 2372. The district court utilized the *Milivojevich* factors in its analysis, appropriately summarizing them into five elements which, if met, support the conclusion that a church is hierarchical. The five elements spelled out by the district court are as follows:

1) The corporations in question are organized under the state religious corporations act governing the incorporation of religious societies that are subordinate parts of larger church organizations.

2) Resolutions of the subordinate entity acknowledge the superiority of the superior entity.

3) By-laws of the lower authority have been submitted to the higher for approval.

4) The priest takes an oath to be obedient to the higher authority.

5) Provisions in the constitutions and by-laws of both the superior and subordinate levels suggest a hierarchical relationship.

Opinion at 717–18; 172 F.Supp.2d at 716.

Our examination of this record, and our study of the organization and operation of the Episcopal Church, compels the determination that the court was correct in both its analysis and in its conclusion: The Episcopal Church is hierarchical. Specifically, but by way of example only: (1) the Bylaws of St. John's were adopted pursuant to the Canons of the Episcopal Church of the Diocese of Washington together with the Maryland Vestry Act; (2) The Maryland Vestry Act provides for the "full power and authority" of a vestry to choose a new minister or reader, "[p]rovided, however, that no action shall be taken hereunder contrary to provisions, consonant with public law, or the Constitution and Canons of the Protestant Episcopal Church, or of the Diocese of said Church wherein the parish is located," 1976 Md. Laws Ch. 96, § 312J; and (3) every Episcopal priest, upon ordination, takes an oath to be obedient to the Church, the Diocese, and his or her Bishop.[22] In sum, we agree with the district court that "each and every characteristic mentioned by the Supreme Court in *Milivojevich* as establishing the hierarchical nature of a church is indisputably present here." Opinion at 718; 172 F.Supp.2d at 717.

In their appeal, the Defendants implicitly concede that the Church is hierarchical.

Indeed, the Vestry does not contend that it alone, rather than Bishop Dixon, possesses the final word on the selection of its Rector; it acknowledges that Bishop Dixon had a period of thirty days, under Canon III.17, within which to object to the selection of Father Edwards. This concession recognizes that the Vestry's choice of a Rector is subject to the Bishop's approval and that the Vestry is subject to the rulings of a hierarchy. And the Vestry could not in good faith contend otherwise, in view of Canon III.17 and the canonical provisions forbidding a vestry from *discharging* a rector without the approval of the proper bishop. Canon III.21. As the district court observed, the very word "bishop" derives from roots meaning "overseer." Opinion at 720; 172 F.Supp.2d at 718. "Episcopalism" is said to mean "the theory that in church government supreme authority resides in a body of bishops and not in any one individual." *Webster's Third New Int'l Dict.* 765 (1976). And the Canons of the Episcopal Church clearly establish that it is a hierarchy. *See, e.g., Hiles v. Episcopal Diocese of Mass.*, 51 Mass.App.Ct. 220, 744 N.E.2d 1116, 1121 (Mass. Ct.App.2001) ("It is undisputed that the Episcopal Church is hierarchical in structure; there are no judicial holdings to the contrary.").[23]

---

**22.** The ceremony for ordination of a priest in the Episcopal Church, where the priest takes an oath of obedience, includes the following ritual exchanges:

The Bishop says to the ordinand
. . . . And *will you,* in accordance with the canons of this Church, *obey your bishop and other ministers who may have authority over you and your work?*
Answer
I am willing and ready to do so. . . . *I do solemnly engage to conform to the* doctrine, discipline, and worship *of The Episcopal Church.*

. . . .

Bishop *Will you respect and be guided by the pastoral direction and leadership of your bishop?*
Answer *I will.*
*BCP,* The Ordination of a Priest (emphasis added).

**23.** Other decisions considering this question and concluding that the Episcopal Church is hierarchical include: *Trustees of the Diocese of Albany v. Trinity Episcopal Church,* 250 A.D.2d 282, 684 N.Y.S.2d 76, 78 n. 2 (1999) ("The Protestant Episcopal Church is a hierarchical form of church government in which local parishes are subject to the constitution, canons, rules and decisions of their dioceses,

### 3.

Because the Episcopal Church is hierarchical, we must next assess whether Bishop Dixon, in the context of this dispute, is its highest ecclesiastical authority—i.e., whether her decision with respect to Father Edwards and the Vestry is binding upon us. In arguing to the contrary, the Defendants contend that disciplinary proceedings are pending against Father Edwards in the Diocese of Fort Worth concerning the events at St. John's, and that until those proceedings conclude, no "final authority" has spoken. In order for the ecclesiastical proceedings in Fort Worth to have relevance here, however, they must have some capacity to affect the situation at St. John's. And on this point the Defendants have been entirely unable, in either their written or oral presentations, to raise any genuine question concerning whether the tribunal in Fort Worth can establish Father Edwards as the Rector of St. John's Parish.

The Fort Worth Presentment is an entirely separate proceeding from this case; it is only concerned with the disciplinary charge against Father Edwards, and it focuses on his conduct alone. Whatever its outcome, it cannot determine the validity of Bishop Dixon's decisions in the Diocese of Washington. If Father Edwards is vindicated in Fort Worth, he will not be subject to church discipline there. In no event, however, will he thereby be established as Rector of St. John's in Maryland. In this circumstance, the Fort Worth disciplinary proceeding against Father Edwards is irrelevant to the dispute before us. *See Hiles*, 744 N.E.2d at 1122 (observing that ecclesiastical disciplinary proceedings did not implicate controversy before the court).

In the Episcopal Church, the priests and the laity of a diocese are subject to the authority of their bishop. While the dispute between Bishop Dixon and the Vestry of St. John's may concern St. John's control of its own affairs, the Canons of the Church fail to provide a vestry or a parish congregation with final authority over all church matters. Most significantly, the Review Committee of the Church has already determined that Bishop Dixon did not violate its Canons, and the Canons provide for no further appeal or review of her decision. Therefore, Bishop Dixon is the highest ecclesiastical tribunal of the Church for the purposes of this dispute.[24]

which, in turn, are presided over by a bishop...."); *Parish of the Advent v. Protestant Episcopal Diocese of Mass.*, 426 Mass. 268, 688 N.E.2d 923, 925 (1997) ("[T]he First and Fourteenth Amendments require that we accept as binding the interpretation of the constitution and canons of PECUSA and the Diocese by the bishop, the highest ecclesiastical authority for adjudicating these issues."); *Moses v. Diocese of Colorado*, 863 P.2d 310, 327 (Colo.1993) (en banc) ("[A] priest is not independent of the [Episcopal] Diocese but is controlled by the Diocese and the bishop."); *Bjorkman v. Protestant Episcopal Church*, 759 S.W.2d 583, 586 (Ky.1988) ("In this case the church organization is hierarchical."); *Bennison v. Sharp*, 329 N.W.2d 466, 472 (Mich. 1983) ("[T]he undisputed facts show the Protestant Episcopal Church to be hierarchical with regard to property, as well as spiritual

matters."); *Tea v. Protestant Episcopal Church*, 96 Nev. 399, 610 P.2d 182, 184 (1980) (finding no error in district court's conclusion that church was hierarchical); *Protestant Episcopal Church v. Graves*, 83 N.J. 572, 417 A.2d 19, 24 (1980) ("The Protestant Episcopal Church in the United States of America is a hierarchically structured organization which by virtue of its constitution and canons exercises pervasive control over its constituent parishes....").

24. There may be an issue, under the Constitution and Canons, whether the Review Committee possessed the authority to overturn Bishop Dixon's decision on the licensing of Father Edwards, or whether it merely possessed the ability to sanction her if the decision was improper. Because the Review

### B.

Stripped to its essence, the dispute ·between Bishop Dixon and Father Edwards concerns whether the principles governing the Episcopal Church authorize the Bishop to refuse Father Edwards a license. The Defendants maintain that a "duly qualified" priest is merely one in good standing; Bishop Dixon, on the other hand, maintains that a "duly qualified" priest is one whose views are not inconsistent with her ministry. The resolution of this disagreement is beyond our competence as a civil court, because "it is the function of the church authorities to determine what the essential qualifications of [clergy] are and whether the candidate possesses them." *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16, 50 S.Ct. 5, 74 L.Ed. 131 (1929).[25] In any event, the Review Committee has already decided that Bishop Dixon made a reasonable good–faith interpretation of the Canons, and it has declined to discipline her for her actions.

 In the final analysis, it was for the Episcopal Church to determine whether Bishop Dixon was acting within the bounds of her role as Bishop *Pro Tempore* of the Diocese of Washington. When the Review Committee found that she did not act improperly, it dismissed the charges against her. The issue of her authority has not thereafter been questioned in any pending church adjudication. Her decision is therefore final and binding, and it must be recognized as such by a civil court.

Committee declined to proceed against Bishop Dixon, that issue is not before us.

**25.** While the Defendants' amici assert that the district court erred in failing to interpret Canon III.17 to limit Bishop Dixon to thirty calendar days in which to object, and that it

### VI.

 Finally, we turn to the Defendants' challenge to the permanent injunction entered by the district court. As a general matter, when the scope of an injunction is challenged, we review its terms for an abuse of discretion. *Tuttle v. Arlington County School Bd.*, 195 F.3d 698, 703 (4th Cir.1999). In so doing, we review the court's underlying factual findings for clear error and its conclusions of law de novo. *Virginia Soc'y for Human Life, Inc. v. Federal Election Comm'n*, 263 F.3d 379, 392 (4th Cir.2001). Of course, a mistake of law by a district court is per se an abuse of discretion. *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 150 (4th Cir.2002).

In addressing Bishop Dixon's request for injunctive relief, the district court found, inter alia, that the Defendants had denied her access to Christ Church. It also found that they had barred her from celebrating the Eucharist with her parishioners at St. John's, and that she was compelled to utilize a basketball court outside the church building for an alternate religious service. Moreover, Bishop Dixon's alternate service was disrupted, and she was threatened with charges of criminal trespass. And after the expiration of the sixty-day window, when Father Edwards was no longer authorized to officiate within the Diocese of Washington, he continued to occupy the rectory and hold himself out as the Rector of St. John's.

 Because of this activity and the Defendants' related acts of defiance of Bishop Dixon, the court, on October 29,

erred by impermissibly expanding the definition of a "duly qualified" priest, the court commendably refused to address these issues. Such interpretations of the Canons of the Episcopal Church are beyond the province of a civil court.

2001, entered its injunction. It enjoined Father Edwards from, inter alia, acting as Rector of St. John's, and also from officiating at religious services "on or near" the grounds of St. John's. On November 2, 2001, when the Defendants noticed their appeal to this Court, they contemporaneously sought a stay of judgment pending appeal, asserting, among other things, that the "on or near" provision in the injunction's Paragraph (b) infringed upon the First Amendment rights of Father Edwards. In response to this contention, the court entered its November 21, 2001, Modification Order, and it thereby superseded the challenged "on or near" provision with an amended injunction permitting Father Edwards to "conduct religious services at least 300 feet distant from the perimeter of Christ Church, St. John's Parish." Modification Order at 6. The Defendants, however, did not thereafter object in the district court to the terms of the Modification Order, nor did they seek to vacate or modify its terms and conditions.

On appeal, the Defendants continue to maintain that the "on or near" provision unconstitutionally restricts Father Edwards's freedom of religion and expression. Their contention on this point is moot, however, because that provision has been superseded by the Modification Order. They otherwise challenge the injunction in two respects, contending that (1) it prevents Father Edwards from conducting services generally, and (2) because the Vestry owns the Parish property in fee simple, it cannot be enjoined from inviting Father Edwards to perform services thereon. Neither of these contentions has merit.

First of all, Father Edwards is not prohibited from conducting services generally; the injunction simply prohibits him from holding himself out as licensed by the Ecclesiastical Authority of the Diocese of Washington and, in certain respects, from officiating in connection with St. John's Parish and Christ Church. The court placed no restrictions on his ability to believe in or practice his religion outside specified boundaries. On the second point, concerning the use of Parish property, the Vestry, under the Parish Bylaws and the Maryland Vestry Act, is already precluded from acting in violation of the Constitution and Canons of the Episcopal Church. Because the highest ecclesiastical authority of the Diocese, Bishop Dixon, has determined that the Vestry's interpretation of the Canons is incorrect, this challenge to the injunction is without merit.

On the other hand, we see the "buffer zone" aspect of the injunction, as set forth in the Modification Order, as troublesome. While the Defendants' challenge to the buffer zone may have some merit, it is significant that Father Edwards and the Vestry failed to challenge the Modification Order in the district court. We should not, unless an error is plain, or unless our refusal to address an appeal would result in a fundamental miscarriage of justice, ordinarily consider an issue which is first raised on appeal. *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir.1998); *see also Taylor v. Virginia Union Univ.*, 193 F.3d 219, 239–40 (4th Cir.1999) (stating that error not raised below in civil proceedings is reviewed, at minimum, for plain error). Because of the compelling importance of preserving First Amendment principles, however, *see Keyishian v. Board of Regents*, 385 U.S. 589, 604, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), and based upon the prudential consideration of according the district court a full opportunity to first consider a challenge to its Modification Order, we will remand for further consideration of the buffer zone issue. *See S.D. Myers, Inc. v. City & County of San Fran-*

*cisco,* 253 F.3d 461, 465 (9th Cir.2001) (affirming but remanding for consideration of issue initially raised on appeal).

In connection with our remand, we make the following explanatory observations. While the Modification Order prohibits Father Edwards from officiating at religious services within 300 feet of the "perimeter of Christ Church," the Modification Opinion provides that the injunction is being modified to create a 300–foot buffer zone "from the perimeter *of the property* of Christ Church." Modification Opinion at 3 (emphasis added). Although the language of the Modification Order is controlling, because courts speak through their orders, *New Horizon of N.Y. LLC v. Jacobs,* 231 F.3d 143, 152 (4th Cir.2000), this significant discrepancy between the Modification Opinion and the Modification Order makes it difficult to ascertain the proper boundaries of the buffer zone where Father Edwards is not to officiate.[26] To the extent the buffer zone extends beyond the boundaries of the Christ Church property—and those boundaries are not in the record before us—its existence may be constitutionally problematic. *See Madsen v. Women's Health Ctr.,* 512 U.S. 753, 775, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (striking down 36–foot buffer zone insofar as it encroached on private property and 300–foot buffer zone around residences as unconstitutional); *Schenck v. Pro–Choice Network,* 519 U.S. 357, 377, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (striking down fifteen-foot floating buffer zone around patrons entering abortion clinic, but upholding fixed buffer zones around doorways, driveways, and driveway entrances as warranted in circumstances).

26. For example, does the 300 foot buffer zone run from the edge of the church building at Christ Church, or does it run from the property line of the real estate on which the church building sits? We also note that, whether intended or not, the Modification Order applies only to Christ Church, and that this aspect of the injunction is inapplicable to Pomonkey Chapel, the other church in St. John's Parish.

## VII.

For the foregoing reasons, we affirm the district court's award of declaratory and injunctive relief to Bishop Dixon. We remand, however, for further proceedings concerning the buffer zone created by the injunction.

*AFFIRMED AND REMANDED.*